■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEPHEN WALSTON, Appellant.—Appeal by defendant from a judgment of the County Court, Suffolk County, rendered August 9, 1977, convicting him of criminal possession of stolen property in the third degree, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a

hearing, of defendant's motion to suppress certain physical evidence. Judgment reversed, on the law, motion granted, indictment dismissed, and case remitted to the County Court, Suffolk County, for the purpose of entering an order in its discretion pursuant to CPL 160.50. On May 18, 1976, at about 3:00 A.M., Patrolman Allen Sendlenski of the Southampton Town Police Department was on duty in a marked patrol car, when he observed a U-Haul van bearing out-of-State license plates pass his position. Sendlenski was aware of two burglaries in the vicinity within the past week and, inasmuch as he did not recognize the van, he followed it in his patrol car. After the patrolman had been following the van for some three to five minutes, he observed it make a turn and "speed up" abnormally. The taillights on the van went out for about two to three seconds and, when they came back on, the van had moved laterally so that it was traveling in the middle of the road. Suspecting either an equipment violation or that the driver was intoxicated, Sendlenski stopped the van a short distance later. The officer exited from his patrol car and approached the driver's side of the van. He was carrying a shotgun in "port arms position", meaning that the barrel was "pointed directly overhead, taller than the tallest individual in the group." The shotgun had five rounds in the magazine, but there were no rounds in the chamber and the officer's finger was not on the trigger. His service revolver was in its holster. As Sendlenski approached the van the driver opened the door and exited the vehicle. The officer recognized him as Richard Walston, defendant's brother. He asked Richard for his operator's license and the registration for the van. Richard could produce neither of these, nor could he produce the rental agreement for the van. Sendlenski believed that Richard's license had been suspended and he intended to obtain a license check as well as a stolen car check on the van. Before he did so, the passenger door of the van opened and defendant emerged, greeting Sendlenski by name. Sendlenski recognized defendant as well. Defendant told the officer that Richard was driving because he (defendant) was too tired to do so. Sendlenski then returned to his patrol car to put his shotgun back in its rack. At that time, he asked defendant to sit in the front seat of the patrol car. Defendant complied. Richard, in the meantime, had moved back behind the steering wheel of the van, also at Sendlenski's request. The officer then returned to the van and removed the keys from the ignition as a precautionary measure. After doing so he walked around to the front of the van and looked through the windshield with his flashlight. He observed a wire mesh screen between the seats and the rear of the van. The screen was smaller than the width of the van, leaving a gap of some four or five inches at both ends. Sendlenski shined his flashlight into the gap behind the driver's seat and observed several items of furniture in the rear. He then returned to the driver's side of the van, asked Richard to remain seated behind the wheel and walked back to the patrol car to call for a license check on Richard and a stolen car check on the van. While he was awaiting the results of his check, Sendlenski engaged defendant in conversation. He had not advised defendant of his rights at this time. The officer asked defendant where the furniture had come from. Defendant told him that it had come from a hall in the Centereach area and that he and his brother were transporting it to the Selden area for a dance. Selden and Centereach are adjoining communities. The point where Sendlenski had stopped the van was 37 miles from Selden. Sendlenski asked defendant why he and his brother couldn't have gone directly from Centereach to Selden to deliver the furniture. Defendant replied that they had to go to Bridgehampton to obtain a key from a girl named Charlton, so they could gain entrance

to the hall in Selden. However, the girl had not been home. Sendlenski was then advised by headquarters that Richard's license had indeed been suspended. He asked defendant to remain in the patrol car and he returned to the van, advised Richard that his license had been suspended and placed him under arrest. He then asked him about the furniture. The story Richard told was similar to defendant's except that Richard stated that Charlton had been at home, and that he and his brother had gotten the key from her. Sendlenski then radioed his adjoining sector to respond to Charlton's address to ascertain whether the Walstons had been there. He was subsequently advised that the Walstons had not been at Charlton's and that Charlton had not seen them. The officer then advised defendant that under the rules and procedures of the Southampton Town Police Department the van was being impounded and he was being taken to headquarters as a suspect in a possible crime. He had not been formally arrested at that time. Sendlenski radioed for assistance. The officer who had responded to Charlton's address subsequently arrived at the scene and together the two officers opened the side door of the van and observed several items of furniture piled haphazardly in the van. A combination *Huntley* and suppression hearing was held. At the conclusion of the hearing, the court suppressed all statements made by defendant subsequent to the time he had been "requested" by Patrolman Sendlenski to sit in the patrol car. The court, however, refused to suppress the articles seized from the van. During the ensuing trial, defendant elected to plead guilty to criminal possession of stolen property in the third degree. In our view the motion to suppress the articles seized should have been granted. There is no question that when Patrolman Sendlenski, still carrying his shotgun, directed defendant to sit in his patrol car, defendant was seized within the meaning of the Fourth Amendment. There was no probable cause for this seizure. Furthermore, even if the seizure were proper defendant could not have been questioned unless and until he had been advised of his rights. Inasmuch as Patrolman Sendlenski did not advise defendant of his rights before questioning him as to the circumstances surrounding the presence of the furniture in the van, defendant's answers to such questions were properly suppressed. However, more is required here, for without defendant's obviously transparent explanation regarding the furniture, Patrolman Sendlenski would not have possessed probable cause to conduct the subsequent search of the van, which led to the discovery that the articles therein had been stolen. Certainly, Sendlenski's initial investigation into the contents of the van by use of his flashlight, although proper, could not reasonably have led him to conclude that the furniture had been stolen. Nor did anything which occurred subsequent to the questioning of defendant serve to break the chain between defendant's statement and the search of the van. Accordingly, the search herein was tainted by the improper questioning of defendant by Patrolman Sendlenski. Upon this view, the articles seized from the van should have been suppressed (see *Brown v Illinois,* 422 US 590; cf. *Wong Sun v United States,* 371 US 471). O'Connor, J. P., Shapiro, Cohalan and Margett, JJ., concur.