■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DEREK JOHN MILASKI, Appellant. — Appeal from a judgment of the County Court of Broome County (Coutant, J.), rendered March 22, 1982, convicting defendant upon his plea of guilty of the crime of attempted burglary in the second degree. On this appeal, defendant contests the determination of the trial court which, after a pretrial suppression hearing, ruled admissible certain property (a shotgun) seized from him and his oral and written statements which implicated him in the crime to which he pleaded guilty. The investigation of defendant commenced on or about October 29, 1981 at about 4:00 A.M. when he drove an automobile to the dead-ended parking area of Scarborough Drive near the Riverhouse Lanes and the Reel to Reel disco in the Town of Union, Broome County. This area had been the scene of a number of complaints and arrests for public disturbances, drug-related offenses, and assaults, and earlier that same evening an arrest had been made there for public mischief. Therefore, the

State Police kept it under routine surveillance and at the time of defendant's arrival two veteran troopers were checking a couple in an unlighted car that was parked there. Defendant was driving a 1970 Plymouth and approached at a fairly high rate of speed. When he was within 50 feet of the unlighted troop car, he turned his lights off and on quickly, stopped abruptly and began to back up. One of the troopers approached the car and defendant jumped out, leaving the driver's door open. When asked, defendant said he was looking for his buddy and that he had driven there to urinate. In response to the trooper's request for his license and registration, defendant produced his license, but said that the car was registered in his buddy's name and that he was in the area to return the car to his buddy. When defendant leaned into the car to check the glove compartment for the registration, the trooper shined his flashlight into the vehicle to assist him. Personal household items were visible and defendant explained that he was moving to his girlfriend's house. After defendant went to an area to urinate, he returned to the car, was told to empty his pockets, and was then frisked by one of the troopers. No contraband or any incriminating evidence was found, nor was anything dropped by defendant in the vicinity of the urination. A radio check of the vehicle revealed that it was owned by a Ricky Spencer, a known burglar. The trooper again checked the vehicle with a flashlight by the opened driver's door, and spotted a Browning 16 gauge shotgun wrapped in a piece of cloth tucked halfway under the driver's seat. The trooper took the gun and determined that it was unloaded. The trooper asked his companion trooper to run "a special file check" on the gun. Defendant said he received it as a Christmas gift from his father. The first radio report made on the gun informed the troopers that it was not stolen. Shortly thereafter, a second transmission stated that defendant was known to hang around with Ricky Spencer and that defendant had previously been arrested for burglary. After this report, and in order to test defendant's familiarity with the criminal justice system, one of the troopers asked defendant if he had a "P.O." Knowing that this abbreviation meant probation or parole officer, defendant told the trooper the name of his officer and the conditions of his probation. Defendant was advised of his *Miranda* rights after being informed that his possession of the gun might have violated the law or the conditions of his probation. The gun was confiscated and defendant was issued an equipment violation ticket and permitted to go his own way. Several days later, on November 2, 1981, after it had been ascertained that the gun had been stolen in a series of burglaries, an investigator went to defendant's girlfriend's home to speak with him. Another investigator had already spoken to a Robert Hammond, who implicated defendant and Ricky Spencer in the burglaries. At first, defendant's girlfriend told the trooper that defendant was not home, but then the girlfriend invited the trooper into the house where defendant agreed to speak to him unofficially, "man to man". Defendant accompanied the trooper to his car and admitted his involvement in the. burglary in which the shotgun was stolen. Defendant was allowed to returned to the house to speak to his girlfriend, and he then accompanied the trooper to the police station. There, in a telephone conversation with the Broome County District Attorney, defendant was promised that no further charges would be brought against him if defendant gave a written statement about the burglary involving the shotgun. Defendant signed such a statement, as well as one about the disposal of numerous stolen guns from the Town of Fenton. On March 4, 1982, a pretrial suppression hearing was held to determine the admissibility of the property seized from defendant and his statements and admissions. After defendant's motion to suppress was in all respects denied, defendant pleaded guilty to attempted burglary in the second degree in satisfaction of all pending charges and was sentenced as a second felony

offender to an indeterminate term of two to four years' imprisonment. We agree with the suppression court's ruling that the evidence was permissibly obtained. Although defendant truthfully admitted the ownership of the car he was driving and did not possess any contraband on his person and was not participating in any criminal activity when first observed by the State Police, his presence in a known crime area at 4:00 A.M., the manner in which he flashed his car lights off as if signaling, and his backing the car up when he saw the troopers, provided the troopers with reasonable suspicion to inquire of defendant his identity and an explanation for his being there. Significantly, defendant never asked to leave, nor is there any indication of forcible detention. The nervous attitude of defendant and the evasiveness of some of his answers, as well as the household goods that were visible, permitted the troopers to have the vehicle checked out. The degree of interference by the State Police from its inception was reasonably related in scope to the circumstances which rendered its initiation permissible (see *People v De Bour,* 40 NY2d 210). The body search of defendant may have been unreasonable under the circumstances, but it revealed nothing and did not intimidate defendant in any way and so may be disregarded. Having decided that the intrusion was warranted in the degree exercised by the police, it follows that the shotgun was properly seized. The shotgun was observed by the troopers, partially under the front seat, in plain view from outside of the car since its door was left open by defendant. The fact that the gun was not observed when the police first looked into the car or when defendant went to the glove compartment to obtain the registration is not significant, for there is no showing that the troopers were looking for a gun, or had stopped defendant in order to search his car, or expected to find any contraband when they flashed their light inside (see *Texas v Brown,* 460 US __, 103 S Ct 1535). If it had been daytime, the gun would have been visible without any visual aid. In this sense, the gun's discovery was properly held inadvertent, rendering it admissible. After the seizure of the gun, defendant was given his *Miranda* warnings. The admissions that followed were, therefore, also properly received. It is important to note that defendant was not apprehended on October 29, 1981. Only the gun was confiscated. It was days later, after it was learned that the gun had been stolen and defendant had been implicated in the theft, that defendant was again interviewed at his girlfriend's home and, after again being given his *Miranda* rights, gave statements that were properly ruled admissible. Inasmuch as defendant's constitutional rights were not violated, the judgment of conviction should be affirmed. Judgment affirmed. Casey, Yesawich, Jr., and Weiss, JJ., concur.

Sweeney, J. P., and Levine, J., dissent and vote to reverse in the following memorandum by Levine, J. Levine, J. (dissenting). There can be no dispute that the stopping of defendant's vehicle by the police, their frisking him and otherwise restricting his personal movement, and their inspecting the vehicle and ultimately seizing the gun from it, must all pass muster under applicable Fourth Amendment standards. This remains true even though the gun was discovered by shining a flashlight into the car without any prior actual physical intrusion into the vehicle by the police (see *People v Harrison,* 57 NY2d 470; *People v Smith,* 42 NY2d 961). The varying degrees of police invasion of defendant's right to be left alone involved here thus have to be measured under the four-level criteria of the *De Bour* case (*People v De Bour,* 40 NY2d 210, 223). As alluded to in the majority's decision, the initial factual circumstances presented to the police, namely, defendant's presence at 4:00 A.M. in a known crime area, his flashing the car lights on and off, and backing the car up after observing the troop car, never rose beyond the second *De Bour* level, i.e., the common-law right to inquire and temporarily interfere with movement to gain explanatory information (*supra*). The majority concedes as

much. It seems clear to us, however, that the right of the police temporarily to restrict defendant's leaving the scene and direct questions to him (the second level of intrusion under *De Bour*) was totally exhausted by (1) defendant's truthful answers and verification concerning his identity, (2) his plausible explanation for driving to this secluded area (to urinate), (3) his equally plausible information regarding the ownership of the car (which the police verified) and that of its initially observed contents, and (4) the absence of any observable weapon during the first two inspections of the interior of the car. The police testified that they were not in fear for their own safety. Objectively, all that the police had left to justify their continued interest in defendant was that he appeared nervous and that his friend who loaned him the car was a convicted felon. The nervousness of one subjected to this kind of police confrontation is, as a matter of law, an insufficient ground upon which to base prolonged detention for a frisk (see *People v Johnson,* 79 AD2d 936, affd 54 NY2d 958). Having a friendship with and using the car of a convicted felon adds nothing. Even if defendant had been physically accompanied by a known lawbreaker at the time of the stop, his further detention and the search of his person would not have been justified (see *Sibron v New York,* 392 US 40, 64; *People v Prochilo,* 41 NY2d 759, 763). Thus, at this point, defendant should have been permitted to re-enter the car and depart from the scene. "Therefore, when the purpose of the stop has been satisfied, reasonable suspicion ceases to exist, and continued detention is unlawful" (Hall, Search and Seizure, § 10:13, p 329). As similarly stated in *People v Cunningham* (50 AD2d 69, 71): "Cunningham complied with the three statutory requirements of name, address and explanation, even to the extent of displaying the items in the bag he was carrying and, as noted, he told the officers where he worked. At that point, surely, he was no source of danger to the police officers and was, or should have been, free to go on his way without let or hindrance." Instead, the police then escalated their physical intrusion in the instant case by frisking defendant, ordering him to empty his pockets and disregarding his repeated inquiries as to what right they had to further detain and search him. These acts constituted an effective seizure of defendant's person, the justification for which has not been shown by way of specified, articulable facts for a continued reasonable suspicion of criminal activity, let alone probable cause (*People v Harrison,* 57 NY2d 470, *supra; People v Nelson,* 57 NY2d 826, revg on dissenting opn below 83 AD2d 689, cert den __ US __, 103 S Ct 1449; *People v Carrasquillo,* 54 NY2d 248; *People v Allende,* 39 NY2d 474; *People v Cantor,* 36 NY2d 106; *People v Colwell,* 96 AD2d 649; *People v Randall,* 85 AD2d 754). It seems hardly debatable that if the police had acted properly here and had honored defendant's wish to be left "free to go on his way without let or hindrance", there never would have been the third inspection of the car during which the shotgun was discovered. This being so, the shotgun was the product of defendant's illegal detention; it was illegally seized and it should have been suppressed. As the Court of Appeals held in *People v Allende (supra,* p 477), in suppressing a gun observed on the seat of a car under similar illegal detention: "Had it not taken place, Officer Friedman would not have been in a position to have a 'plain view' of the first gun and to discover the other evidence to which it led * * * Therefore, 'to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it' * * * the evidence should have been suppressed". The foregoing should serve conclusively to dispose of any invocation of the "plain view" doctrine to uphold the seizure here. We add, however, that the use of the plain view exception fails here for other reasons. It applies only if the facts and circumstances satisfy a threefold test that (1) the observation was made from a lawfully obtained vantage point, (2) the object was observed inadvertently, and (3) the

evidentiary value of the observed article was immediately apparent (*Coolidge v New Hampshire,* 403 US 443, 446-471; *People v Jackson,* 41 NY2d 146, 150). The seizure of the shotgun here fails all three facets of the *Coolidge* test. After their two prior visual inspections had not revealed its existence on the floor of the vehicle, the only possible inference is that if the police had not continued defendant's illegal detention and *had not also physically thwarted defendant's attempts to close the car door,* they would not have been in a position to see the gun during the third inspection. The police candidly admitted that in undertaking the third inspection they were "looking for any contraband". Thus, the discovery of the gun was clearly not inadvertent, but was the product of a deliberate general search for which they had no legal justification. Nor was the evidentiary value of the gun immediately apparent. It was not seized because it posed any danger to the police, but in order to find out whether it was stolen, to which their initial check proved negative. The gun was found to be unloaded. There was nothing apparently illegal about defendant's possession of it in the car. Only after eliciting admissions from defendant about his prior record (during defendant's illegal detention) did the police ascertain the possibility that it was unlawful for him to possess it. This alone forecloses application of the plain view exception to the instant case (see *People v Richie,* 77 AD2d 667, 668; *People v Walston,* 67 AD2d 668, 669-670). For the foregoing reasons, we disagree with the majority's holding that County Court was correct in denying defendant's motion to suppress the shotgun. As to defendant's confessions to the burglary for which he was indicted, the testimony of the State Police BCI investigator to whom the confessions were made establishes beyond any doubt that defendant's co-operation was obtained immediately as a result of his being confronted with the fact that the shotgun previously illegally seized from him by the police was the product of that burglary. Since his confessions were thus the direct product of police exploitation of the prior illegal seizure of his person and of the shotgun, they, too, must be suppressed (see *Brown v Illinois,* 422 US 590; *People v Hauser,* 80 AD2d 460). Accordingly, defendant's conviction should be reversed, his motion to suppress the gun and his confessions granted, and the matter remitted to County Court for trial.