OPINION OF THE COURT
Jasen, J.
Our task on this appeal is limited to determining whether law enforcement officers, given the facts of this case, acted *17 reasonably in ordering defendant and a cohort to lie on the ground in order to effectuate a "stop and frisk”. Resolution of this issue is determinative of whether defendant’s motion to suppress was properly denied.
The relevant facts, as found by the courts below, are as follows: Police Officer John Dieterich and his partner, Officer Gary Stryker, were on anticrime patrol in the vicinity of 64th Street and West End Avenue in New York City during the evening hours of January 4, 1977. Both officers were dressed in plainclothes. While traveling southbound on West End Avenue in an unmarked taxi, the officers spied three persons, two males and one female, huddled in a phone booth at the corner of 64th Street. Their suspicions aroused, the officers turned their car in a northbound direction, and stopped at the intersection of 63rd Street, from where they observed the individuals for approximately one minute. One male, later identified as Anthony Hernandez, then left the booth and commenced walking south on West End Avenue towards 63rd Street. As he walked away, Hernandez glanced over his shoulder several times to peer back towards 64th Street. Hernandez turned east onto 63rd Street, but returned to the corner to look back in the direction of the phone booth.
Officer Dieterich exited the taxi and followed Hernandez á short distance down 63rd Street, at which time Hernandez entered a housing project schoolyard. At this point, Dieterich returned to the car and the officers drove north on West End Avenue, turned east on 64th Street, and stopped on the north side of the playground. Officer Dieterich again left the car in an attempt to find the persons he and Officer Stryker had seen earlier with Hernandez in the phone booth. Stryker, who continued to keep Hernandez under observation, saw Hernandez engaged in an apparent conversation with another young male, the defendant herein, and further observed "Hernandez hand something to [defendant].” At this time, Stryker received a radio message that a robbery had just occurred at the intersection of 64th Street and West End Avenue. The perpetrator was described as "a young male, black, wearing a blue type ski jacket, and black * * * flop hat” and it was also stated that the perpetrator was "armed with a silver gun.”
Officer Stryker then called Dieterich back to the taxi and informed him as to the contents of the radio call. The officers agreed that Hernandez fit the broadcast description.
Hernandez and defendant then began walking out of the *18 playground towards the parked taxi. Upon approaching the automobile and seeing the officers, the two men abruptly reversed direction and returned to the playground, where they were joined by a female. Officer Dieterich told Stryker to transmit an alarm over the air that they were following a possible suspect in the robbery and, then, Dieterich set out on foot to follow the trio who were walking through the housing project towards Amsterdam Avenue. Stryker swung the taxi down Amsterdam Avenue to intercept Hernandez and defendant. He attempted to contact his communications dispatcher on the portable radio, but no acknowledgment was received.
Stryker parked the taxi and began walking south along Amsterdam Avenue. As the trio approached, Stryker identified himself as a police officer, showed his shield, drew his revolver, and shouted, "Police Officer, freeze. Don’t move, lay face down on the ground.” The group did not comply with the request immediately, but, upon turning around and seeing Officer Dieterich approach, both Hernandez and defendant did as ordered, the female stepping aside. While the two men were on the ground, Dieterich, without touching either man, inquired, "Where is the gun?” Defendant responded, "it’s right here”, and pointed to his right-hand pocket. Dieterich removed a silver-plated revolver, and both men were handcuffed and arrested.
A short time later, more police officers arrived, accompanied by the compláining witnesses who identified the revolver as the same weapon used in the robbery. Hernandez and defendant were transported to the police precinct, where they were informed of their constitutional rights. Defendant denied any participation in the robbery, but admitted ownership of the revolver. Defendant explained that he allowed Hernandez "to hold it”.
A search of defendant at the station house revealed three manila envelopes containing marihuana and two $5 bills, which defendant stated were given to him by Hernandez. Two $10 bills were also found on Hernandez. According to the two robbery victims, they each had been robbed of one $5 and one $10 bill.
Upon these facts, Supreme Court denied defendant’s motion to suppress the physical evidence (the revolver and money) and the statements made by defendant at the time the gun was seized and, later, at the station house after his arrest. The court was of the view that the police officers had probable *19 cause to arrest Hernandez and that the surrounding circumstances justified a stop and frisk of defendant. Further, the court found that defendant’s statement, "it’s right here”, made in response to Officer Dieterich’s question as to the location of the gun, was not the product of custodial interrogation.
After his suppression motion was denied, defendant pleaded guilty to one count of criminal possession of a weapon in the third degree (Penal Law, § 265.02) in full satisfaction of the indictment,[1] and was sentenced to five years probation. On appeal, the Appellate Division, one Justice dissenting, affirmed, ruling that defendant’s motion to suppress evidence was properly denied. Leave to appeal to this court was granted by the dissenting Justice below. We now affirm.
Defendant urges, as his sole ground for reversal, that his right to be free from unreasonable searches and seizures, guaranteed by both the Federal and State Constitutions (US Const, 4th Arndt; NY Const, art I, § 12) was violated by the actions of Officers Dieterich and Stryker. Defendant contends that inasmuch as the seized revolver and his inculpatory statements were products of unlawful police action, they must be suppressed. We disagree.
Street encounters between private citizens and law enforcement officers are inherently troublesome. This is so because two competing, yet equally compelling, considerations inevitably clash, to wit: the indisputable right of persons to be free from arbitrary interference by law enforcement officers and the nondelegable duty placed squarely on the shoulders of law enforcement officers to make the streets reasonably safe for us all. While in an ideal society the two might never clash, a quick glance through our newspapers reveals that our society is far from perfect. Thus, the judiciary is put to the task of balancing these competing considerations, so that they can reasonably coexist.
Defendant stresses that the balance has been struck in his favor, and cites the Supreme Court’s recent opinion in Dunaway v New York (442 US 200) as authority for this contention. In Dunaway, the Supreme Court held that a seizure which was tantamount to an arrest, whether formal or de facto, is *20 reasonable only if supported by probable cause.[2] (Id., at pp 208-216.) Defendant argues that since the police officers did not have probable cause to arrest him, an assertion with which we have no quarrel,[3] his seizure must be labeled unreasonable, thus barring the "fruits” of the seizure from evidence. While defendant’s logic may have superficial appeal, this appeal arises due to its simplicity, rather than a sound application of constitutional principles.
We refuse to accept defendant’s characterization of the police activity with respect to him as an arrest, but, rather, find it analogous to the classic "stop and frisk” procedure.[4] In so finding, we recognize that the concept of arrest should not be artificially limited by traditional notions so as to circumvent the probable cause requirement inherent in the constitutional proscription against unreasonable searches and seizures. (See Brinegar v United States, 338 US 160.) Indeed, when the intrusion involved is of sufficient magnitude, an "arrest” will be said to occur, whether or not the person is eventually transported to the police station and charged with a crime. However, it is equally as clear that not every seizure constitutes an arrest. (See Terry v Ohio, 392 US 1.) Thus, even though it is concluded that a person is seized, this does not mean that the law enforcement officer’s actions must be measured, in all instances, against the probable cause standard.
Although it is difficult to delineate, in abstract principles, the degree of intrusion which elevates a seizure into an arrest, we believe that the actions of Officers Dieterich and Stryker did not constitute an arrest of defendant. It is true that defendant was ordered to lie on the ground, but it is simply inconceivable that the constitutional protection against arbi *21 trary interference by police officers turns upon whether the detainee is positioned against a wall so that a frisk may be effectuated or ordered to lie on the ground. As aptly noted by the majority below, "[w]e are unaware of any statute or decisional authority that states that there is only one constitutionally acceptable manner of accomplishing a frisk.” (69 AD2d, at p 48.) Further, the search was circumscribed; Officer Dieterich reached into defendant’s pocket to remove the revolver only after defendant, in response to a single inquiry, had disclosed its location.
Nor does the fact that the officers approached the two men with guns drawn mandate that a different conclusion be reached. The officers had reason to believe that Hernandez had just committed a robbery, armed with a revolver. Certainly, they were justified in taking precautionary measures to ensure their own safety and well-being, not knowing for certain whether Hernandez or the defendant has possession of the gun. To hold that policemen, thrust into emergency situations where the difference between life and death is often measured in seconds, must isolate those persons whom they have probable cause to arrest from all bystanders before they can draw their guns is patently absurd. We simply cannot accept the premise, urged by defendant, that once a gun is drawn all persons being addressed by the officer are necessarily under arrest. Given the particular facts and circumstances of this case, the presence of the drawn gun did not transform the stop and frisk of defendant into an arrest.
Although we now conclude that defendant was not arrested, our inquiry is not yet completed, for the question whether the officers were justified in stopping and frisking defendant remains for our determination. It is beyond dispute that defendant was seized within the meaning of the Fourth Amendment and the parallel provision of our State Constitution.[5] Thus, we must find that the officers could reasonably suspect that they were in danger of physical injury and that defendant posed a threat to their safety. (See, e.g., Pennsylvania v Mimms, 434 US 106, 111-112; Terry v Ohio, 392 US 1, 27, supra; People v Prochilo, 41 NY2d 759; People v Green, 35 *22 NY2d 193; CPL 140.50, subd 3.)[6] Of course, the answer to this inquiry must turn upon the particular facts of this case.
Here, there can be no doubt that Officers Dieterich and Stryker had probable cause to arrest Hernandez. They observed Hernandez acting in a highly suspicious manner, and their concerns were heightened when they received a radio message that a gunpoint robbery had just occurred at the corner where they observed Hernandez. Further, the broadcast description of the perpetrator matched the physical attributes of Hernandez. Before they could seize Hernandez, however, Stryker saw him "hand something to [defendant].” It is true, as defendant argues, that the officers could not identify the object passed as a weapon, but, certainly, Officer Stryker could have reasonably suspected that the revolver changed hands. Hernandez had an obvious motive to divest himself of the incriminating weapon, and the transfer occurred a short distance from the crime site. Certainly the officers, highly trained in criminal investigatory techniques, could reasonably suspect that Hernandez handed the gun to defendant. Reasonable suspicion, not absolute certainty, is the applicable standard, and it is clear that the officers’ concerns were predicated upon specific and articulable facts.
It should also be noted that when Officer Stryker approached Hernandez and defendant, he knew that his efforts to secure reinforcements had been unsuccessful. He had cause to believe that he was coming face-to-face with a man who had just committed an armed robbery and a companion who he reasonably suspected now possessed the revolver, and that Officer Dieterich, trailing these persons, was his only assistance.
Under these circumstances, we now conclude that the actions of the law enforcement officers in the instant case were reasonable.[7] By ordering the two men to lie on the ground, Officer Stryker did no more than maintain the status quo until additional. information could be elicited. Further, the single question posed by Dieterich — "Where is the gun?” — was *23 certainly justified in order to protect the officers’ welfare.[8] Courts simply must not, in this difficult area of street encounters between private citizens and law enforcement officers, attempt to dissect each individual act by the policemen; rather, the events must be viewed and considered as a whole, remembering that reasonableness is the key principle when undertaking the task of balancing the competing interests presented.
For the above-stated reasons, the order of the Appellate Division should be affirmed.

. Defendant was charged, by indictment, with one count of criminal possession of a weapon in the third degree (Penal Law, § 265.02) and two counts of criminal possession of stolen property in the third degree (Penal Law, § 165.40).

. It is now axiomatic that "[p]robable cause exists if the facts and circumstances known to the arresting officer warrant a prudent man in believing that [an] offense has been committed” by the person to be arrested. (People v Oden, 36 NY2d 382, 384; Brinegar v United States, 338 US 160,175-176.)

. The People do not now contend that the police officers had probable cause to arrest defendant.

. Officer Dieterich’s negative response when asked on cross-examination whether this was a stop and frisk is of little consequence. A fair reading of the suppression hearing transcript indicates that Dieterich was responding to the nature of the forms completed after the police activity had terminated and was not characterizing his actions when he initially encountered defendant. After the revolver was found on defendant’s person, it is beyond dispute that the officers had probable cause to arrest defendant.

. As stated in People v Cantor (36 NY2d 106, 111): "Whenever an individual is physically or constructively detained by virtue of a significant interruption of his liberty of movement as a result of police action, that individual has been seized within the meaning of the Fourth Amendment”.

. The Supreme Court has phrased the applicable standard as follows: "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.” (Terry v Ohio, 392 US 1, 27, supra.)

. Of course, the key principle of the Fourth Amendment and the constitutional analogue of New York State is reasonableness. (E.g., Delaware v Prouse, 440 US 648, 653-654; People v Cantor, 36 NY2d 106, supra.)

. We are of the opinion that this single question did not constitute custodial interrogation, and, thus, the response given by defendant — "It’s right here” — need not be suppressed even though defendant was not informed of his constitutional rights before answering. (See People v Huffman, 41 NY2d 29.)