■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v NATHAN JOHNSON, Respondent. — Order, Supreme Court, New York County, entered on April 30, 1980, granting defendant's motion to suppress physical evidence and certain statements insofar as appealed from, is affirmed. The facts as stated in the dissenting opinion are accurate and need not be repeated herein. The mere purchase of a holster from a 42nd Street novelty shop without the presence of additional objective criteria indicating that "criminal activity is afoot" *(People v De Bour,* 40 NY2d 210, 223), does not permit further intrusion upon the purchaser, other than mere inquiry by the police *(People v Samuels,* 50 NY2d 1035; *People v Batista,* 68 AD2d 515, affd 51 NY2d 996). Under the circumstances confronting us, the actions of the police in requesting information from defendant were reasonable and proper and defendant was not *seized within the meaning of that term.* The threshold of impermissible conduct was crossed when Officer Vitale ordered defendant to open his coat. The predicate for this command, and upon which the dissent would justify the actions of the officer, was the nervous demeanor then exhibited by defendant, which was not evident prior to that point. The act of purchasing a holster must be coupled with other evidence of criminality to permit any higher degree of intrusion. We are not convinced that the equivocal act of purchase was sufficiently elevated by defendant's body language to permit further encroachment. Defendant's actions were not similar to those "potential menacing movements" (i.e., purchase of a holster coupled with defendant's placing his hand in his pocket and subsequent refusal to withdraw it), which confronted the police in *Samuels (supra).* Indeed, defendant did not have to stop and respond to the officer's inquiries *(People v Howard,* 50 NY2d 583, cert den 449 US 1023). However, once this defendant did stop, he was immediately confronted with a display of authority, which in and of itself is a dynamic encounter. The acts of this defendant may have been a reaction to this confrontation and shall not be considered an indication of further criminality. In a similar situation where a street encounter was initiated by a known lawbreaker (i.e., a pimp) and his

accomplice (the defendant), the Court of Appeals ordered the suppression of a weapon because the nervous uneasiness of defendant and the observance by the officer of a heavy object sliding against the material of defendant's pocket did not reasonably indicate the presence of a gun *(People v Prochilo,* 41 NY2d 759, 763). The police were not authorized to lift the defendant's shirt, despite the fact that, as they approached and stopped him emerging from a group of individuals, his hand was in his waistband and wherein there was a suspicious bulge. *(People v Walker,* 70 AD2d 828.) In both instances, the respective courts determined that in the appeals before them the circumstances did not justify the level of intrusion subsequently employed. So too, the additional factors necessary to sanction the command to this defendant to open his coat, are just not present. Nor is there sufficient evidence in the record to conclude that Officer Vitale feared for his safety. Concur — Fein, J.P., Sandler, Ross and Markewich, JJ.; Ross, J., concurs in a separate memorandum; Markewich, J., concurs in the majority memorandum and the concurring memorandum of Ross, J., and Lupiano, J., dissents in a memorandum, as follows.

Ross, J. (concurring). I am in accord with the determination that the seizure of the .22 caliber pistol from this defendant violated his right to privacy. However, I do so only on constraint of the Court of Appeals decisions in *People v Samuels* (50 NY2d 1035) and *People v Batista* (68 AD2d 515; affd 51 NY2d 996). The purchase of a holster, in and of itself, should, as Chief Judge Cooke reasoned in *Samuels (supra,* concurring p 1038), furnish the authorities with the requisite reasonable suspicion of criminality. The act of purchasing this implement, the primary utilization of which is known to all, should transcend the first level of permissible police intrusion and permit the police to encroach on a citizen's liberty to obtain a reason for the purchase, short of a forcible seizure *(People v De Bour,* 40 NY2d 210). Viewed in this light, all of Police Officer Vitale's actions under the circumstances before us would have been proper. By requiring the suppression of this handgun we are placing undue burdens on those whom we entrust with the responsibility of protecting our well-being in times of need. Our actions, and those of other courts whose determinations are binding on us, should not be rendered in a vacuum, but in these decisions, utmost consideration should be given to the realities of everyday living.

Lupiano, J. (dissenting). The People appeal from so much of the order of the Supreme Court, New York County, entered April 30, 1980, as granting defendant's motion to suppress a gun seized at the time of his arrest. At the suppression hearing, Officer Vitale, a policeman for 22 ½ years approximately, of which the last 8 ½ years have been served as a member of the Street Crime Unit assigned to the higher crime areas in the City of New York, testified that on the evening of February 1, 1980, he was on duty with said unit in the Times Square area. Dressed in plainclothes, he was observing the activities occurring in a store at 259 West 42nd Street which sold magazines and equipment, such as holsters, knives and handcuffs. His recent experience over a period of a few months had involved some 12 arrests of persons exiting this same store, for gun possession, subsequent to police observing such individuals purchasing holsters in the store. The officer further declared that in his prior experience, 66% of the persons observed to purchase holsters carried guns on their person at the time. At about 9:15 P.M. Officer Vitale observed the defendant inside the store looking at holsters. The store was well lighted, the officer was approximately 15 feet away, and the duration of the observation (some five minutes) while defendant engaged in selecting and purchasing a holster — all gave the officer an adequate opportunity to observe the demeanor of the defendant. After the salesman put the holster in a bag and defendant paid for this item,

the defendant exited the store carrying the bag. The following testimony of the officer at the hearing vividly describes the unfolding dynamic of this street encounter. "Q What, if anything, did you do at that point? A I approached him at that time, identified myself as a police·officer — Q How did you identify yourself? A Put the shield out and everything. Q And what else did you say, if anything? A I asked him if he had a gun to go with the holster on his person. Q And was there any response, sir? A He stated, no, he didn't have a gun. Q And what else was said, if anything? A Then he was acting very nervous. He was starting to stutter a little, and then I says, 'Well, open your jacket.' Q Well, when you say acting very nervous, could you describe that, if you can? What, if anything, was he doing? A Well, he was like a little jumpy, you know, started to move around a little, and he started to quiver. His voice started to quiver. He said, 'No, I ain't got no gun, man, I ain't got no gun on me.' Q And was he stuttering — was his voice — did he use such a tone as you just used in Court? A When — yes, he did come out — I don't know the exact words. I can't remember exact words but words to the effect that, 'No, I don't have a gun on me, man. I don't have a gun on me.' MR. BARBER: I don't know how to preserve that for the record, Your Honor — THE COURT: Well, I'm hearing. MR. BARBER: You're hearing it. I understand. THE COURT: I'm hearing what the officer said. The officer testified that according to the officer, Mr. Johnson appeared to be nervous after he responded that he didn't have a gun. Q And was anything else said by either you or the defendant prior to your saying to the defendant, 'Open your jacket'? A No, I can't recall. Q At the time that you asked the defendant to open his jacket, were you, sir, fearful for your safety? A Well, yes, when he was nervous, I was slightly — I was. * * * Q After you asked the defendant to open his jacket, what happened then? A He had opened his jacket and I looked at his jacket, inside, and there was a vest. He had a vest on underneath. Q What kind of a vest was that, sir? A Sleeveless vest. It was blue, sleeveless. I forgot what the heck you call them, nylon like. One of these nylon sleeveless vests, underneath, and then he said, 'You want me to take my vest off, too, man? You want me to take my vest off?' I said, 'No, no, it's not necessary.' He had opened it. Q He had opened what then? A His vest then, and he wanted to take it off. He said, 'I'll take it off. I'll take it off. You could search it.' I said 'No, that's all right,' and as he closed his vest up, I observed the gun, 22 caliber, in his right vest pocket. Q And what did you first observe about this gun? A It was a chrome-plated. I knew it was a small gun, because the pockets weren't that big there. Q And what part of the gun did you first see? A The handle, the top of the handle. Q Now, during — what did you then do, sir? A I grabbed for the gun. * * * Q Now, during the course of your entire interaction with this defendant, did you have your gun drawn too? A No." The officer arrested defendant after observing the gun. The officer reiterated and emphasized in response to questioning that the demeanor of the defendant after being approached by the officer who identified himself as a police officer (without drawn gun) and upon the initial inquiry, changed from the nonchalant, relaxed deportment theretofore exhibited to one of nervousness, exhibited in part by a voice which began to quiver, to stutter. The hearing court determined to suppress the gun seized on the ground that the "order for defendant to open his jacket was definitely improper." At the outset it was observed that this order did not amount to an arrest of defendant, which must be justified by probable cause, but is most clearly analogous to a "stop and frisk." As so aptly noted by Jasen, J., in *People v Chestnut* (51 NY2d 14, 19-20): "Street encounters between private citizens and law enforcement officers are inherently troublesome. This is so because two competing, yet equally compelling considerations inevitably clash, to wit: the undisputed right of persons to be free from

arbitrary interference by law enforcement officers and the nondelegable duty placed squarely on the shoulders of law enforcement officers *to make the streets reasonably safe for us all*. While in an ideal society the two might never clash, a quick glance through our newspapers reveals that our society is far from perfect. Thus, the judiciary is put to the task of balancing these competing considerations, so that they can reasonably coexist. \* \* \* when the intrusion involved is of sufficient magnitude, an 'arrest' will be said to occur, whether or not the person is eventually transported to the police station and charged with a crime. However, it is equally as clear that not every seizure constitutes an arrest. (See *Terry v Ohio,* 392 US 1.)" (Emphasis supplied.) The manner of effectuating the frisk in *People v Chestnut (supra)* was by ordering the defendant to lie on the ground. This did not, however, amount to an arrest, the Court of Appeals citing with approval the observation by the majority of the Appellate Division in that case that " '[w]e are unaware of any statute or decisional authority that states that there is only one constitutionally accepta- ble manner of acccomplishing a frisk.' (69 AD2d, at p 48.)" *(People v Chestnut, supra,* p 21.) Respecting the issue of whether Officer Vitale was justified in stopping and frisking defendant, "we must find that the [officer] could *reasona- bly* suspect that [he was] in danger of physical injury and that defendant posed a threat to [his] safety" *(People v Chestnut, supra,* p 21; emphasis supplied). The answer to such inquiry in the circumstances of this particular case is best summed up in the following statement uttered by the prosecutor to the court at the conclusion of the hearing on defendant's motion to suppress: "I think that this entire incident must be seen in the context of the nature of the area, which is a high crime area, as the officer testified, and I believe Your Honor might even take judicial notice of that based upon your experience, but his prior experience, as a member of the Police Department for twenty-three years, and having participated in approximately a hundred, I believe he said, arrests for gun possession, his specific knowledge of this location, and his specific experi- ence with respect to persons who he had seen inside that location, and also most importantly, the specific facts of this case apart from what I have already mentioned — what occurred after the officer stopped the defendant specifi- cally, not just the questions and the responses that were given, 'Do you have a gun that goes with the holster? No, I don't,' but the *manner in which those responses were given. The defendant's deportment at that point,* I think, *is critical in this case,* and the officer testified in some detail as to what the defendant's response was, not just orally, but in terms of his nervousness and how his voice appeared, how his body appeared, and he testified as to how that differed from what he had observed in the five minutes or so that the defendant was inside the store, how it was different at the later point, much more nervous than it was at the first point. 'I had asked the defendant if he had a gun, and the defendant says — ' and the officer used a particular tone of voice when he repeated what the defendant said, 'No, no, man, I don't have a gun,' and described it as being nervous and stuttering slightly, and the officer's asking him a particular question about whether he has a weapon or not, a gun, to go with the holster. The officer's had very specific experience with respect to guns and holsters in that location." (Emphasis supplied.) "The purchase of a holster is directly suggestive of the presence of a gun" *(People v Samuels,* 50 NY2d 1035, 1037). Coupled with such purchase, the nervous uneasiness in defen- dant's manner upon being approached by Officer Vitale who identified himself as a police officer, displayed his shield and made lawful inquiry (all without drawing his gun), is certainly a factor to be considered in determining the reasonableness of Officer Vitale's conduct (cf. *People v Prochilo,* 41 NY2d 759). Officer Vitale, an experienced policeman, unequivocally testified that such

conduct by defendant caused him to be appprehensive for his own safety. Nowhere in the record is there any indication by the hearing court that Officer Vitale's testimony is not credible as a whole or in any particular. Indeed, the nature of his testimony exhibited by the record is supported not only by its own internal consistency, but by commonsense experience of life. We must be mindful of the danger inherent in endeavoring to force the multitudinous forms of actual street encounters into an abstract mold of what constitutes acceptable police conduct. "Courts simply must not, in this difficult area of street encounters between private citizens and law enforcement officers, attempt to dissect each individual act by the policemen; rather; the events must be viewed and considered as a whole, remembering that reasonableness is the key principle when undertaking the task of balancing the competing interest presented" *(People v Chestnut, supra,* p 23). As aptly noted in *Terry v Ohio* (392 US 1, 13-15): "Street encounters between citizens and police officers are incredibly rich in diversity. They range from wholly friendly exchanges of pleasantries or mutually useful information to hostile confrontations of armed men involving arrests, or injuries, or loss of life. Moreover, hostile confrontations are not all of a piece. Some of them begin in a friendly enough manner, and to take a different turn upon the injection of some unexpected element into the conversation. \* \* \* No judicial opinion can comprehend the protean variety of the street encounter, and we can only judge the facts of the case before use." The commonsense requirement that the circumstances surrounding an investigative stop be considered collectively in their totality and not independently was recently observed by the Court of Appeals in *People v Benjamin* (51 NY2d 267). In that case, Judge Wachtler, writing for a unanimous Bench, declared (p 271): "It is quite apparent to an experienced police officer, and indeed it may almost be considered common knowledge, that a handgun is often carried in the waistband. It is equally apparent that law-abiding persons do not normally step back while reaching to the rear of the waistband with both hands, to where such a weapon might be carried. Although *such action may be consistent with innocuous or innocent behavior,* it would be *unrealistic* to require Officer Loran, who had been told that gunmen might be present, *to assume the risk that the defendant's conduct was in fact innocuous or innocent.* Such an assumption would be at odds with his *reasonably acquired* belief that he was in danger and his constitutionally authorized action *(Terry v Ohio, supra). It would,* indeed, *be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety"* (emphasis supplied). Beyond dispute, the police had the right to initiate inquiry based upon the objective credible reason of the purchase of the holster. As I stated in *People v Samuels* (68 AD2d 663, 673-674, affd 50 NY2d 1035): "As aptly noted in *Adams v Williams* (407 US 143, 145-146): 'In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." [392 US 1] at 22. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it might be the essence of good police work to adopt an intermediate response. See id., at 23 \* \* \* The Court recognized in *Terry* that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he may conduct a limited protective

search for concealed weapons. 392 U.S., at 24. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated any applicable state law. So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose.' " Only recently the New York State Legislature saw fit to revise the laws of this State to substantially increase the penalties for those who possess and sell illegal handguns and those who commit crime with handguns (L 1980, chs 233, 234). In approving these new enactments the Governor declared: "We must bring an end to the proliferation of illegal handguns in New York and the intolerable assaults on law enforcement officers and law-abiding citizens. * * * We are determined to rid our streets of those who would do violence to its citizens" (McKinney's Session Laws News, July, 1980, No. 5, p A-243). Indeed, in the "Summary of Legislative Highlights," at page 4 of the supplement No. 5 of McKinney's Session Laws News (July, 1980), there is an acknowledgment that "It is common knowledge that guns are plentiful and easily available for anyone who wants one without complying with registration requirements. Radio station WINS, recently broadcast a series of reports on firearms in New York City; its title was 'Dodge City East'." The reasonableness of Officer Vitale's conduct must be viewed not only with respect to his own experience, but also with regard to what is now recognized as common experience — the plague of illegal handguns visited upon this city. A holster's recognized general purpose is to serve as a carrying case or receptable for a firearm. Indeed, the frequency with which persons enter novelty shops on 42nd Street in the Times Square area (a well-known high crime area) to purchase holsters for their guns is itself a factor of some prominence (see, e.g., *People v Samuels, supra; People v Batista,* 68 AD2d 515, affd 51 NY2d 996). To reiterate, the overall view of Officer Vitale's testimony reinforces the conclusion that it is credible and represents a true scenario of this incident. Defendant presented no evidence at the suppression hearing. The hearing court did not base its suppression ruling on disbelief of the officer's testimony, but on the basis that the circumstances as testified to above, did not justify the directive to defendant to open his coat. The magnitude of this limited invasion of the personal security and property rights of the defendant was not accompanied by the drawing of the officer's weapon or by physical seizure of the defendant's person. It was an oral request to defendant to merely open his coat, a request justified by the surrounding circumstances and having an articulate basis in the officer's own observations of the defendant prior to the street encounter and in consequence of the street encounter. "There is no war between the Constitution and common sense" *(Mapp v Ohio,* 367 US 643, 657). The intrusion on the freedom of the citizen (defendant herein) was, in light of defendant's own conduct, a reasonable response on the police officer's part, and obtained the requisite degree of minimization to comport with common sense and settled legal principles (see *Terry v Ohio, supra; People v Cunningham,* 50 AD2d 69; *United States v Collins,* 532 F2d 79; *United States v Wickizer,* 465 F2d 1154; La Fave, Search and Seizure, § 9.2). Accordingly, the order of the Supreme Court, insofar as appealed from granting defendant's motion to suppress the gun seized, should be reversed and the motion denied.