■ The People of the State of New York, Respondent, v Douglas Van Luven, Appellant. — Judgment, Supreme Court, New York County (Arnold Guy Fraiman, J.), rendered on December 22, 1981, affirmed. Sandler, J. P., concurs in a memorandum, Kassal and Alexander, JJ., concur in a separate memorandum by Alexander, J., and Carro and Fein, JJ., dissent in a memorandum by Fein, J., all as follows:

Sandler, J. P. (concurring). In view of the arresting officer's specific knowledge of the defendant's recent conviction in connection with an attempt to break into a locker at Pennsylvania Station, I believe the police officer had an adequate basis for arresting the defendant for possession of burglar tools when he observed him in Pennsylvania Station near a bank of lockers at 1:00 A.M., next to a green canvas bag in which could be seen a crowbar, screwdrivers and a flashlight. The question is a close one that I believe should be resolved in favor of sustaining the legality of the arrest. It seems to me unrealistic to require the arresting officer to have evaluated defendant's possession of the

---

familiar implements of a professional burglar as though these were the normal tools of an honest workingman whom happenstance had brought to a Pennsylvania Station locker at 1 o'clock in the morning. The arrest being lawful, it follows that defendant's statements to the police after he received *Miranda* warnings provided an appropriate basis for the search warrant that resulted in the seizure of the guns. Accordingly, I find it unnecessary to address the issue of attenuation which Justice Alexander's concurring memorandum finds dispositive.

Alexander, J. (concurring). It appears that on March 11, 1981, defendant was arrested in Pennsylvania (Penn) Station and charged with attempting to break into a locker. He was convicted of this charge on May 27 and was sentenced to time served. The court directed at that time that he stay out of Grand Central and Penn Stations. This information was known to Amtrak Police Officer Rodgers who had been present in the Amtrak police station on March 11, when the defendant was arrested by a fellow officer. Thereafter and on June 16, 1981, at about 1:00 A.M., Amtrak Police Officer Rodgers saw the defendant in Penn Station near a bank of lockers. Defendant's left hand was on the bank of lockers and his right hand was at locker Y861, apparently attempting to open that locker. When defendant saw Rodgers, he moved his hand towards his waistband and turned to walk away. Rodgers approached the defendant and told him to halt, and proceeded to frisk him, taking defendant's hand from his waistband, forcing it open and finding therein a key to locker Y861. As Rodgers had approached the defendant, he saw a green canvas bag on the floor next to the defendant's feet. The bag was open and within could be seen a crowbar, screwdrivers and a flashlight. Rodgers administered the *Miranda* warnings to the defendant and placed defendant under arrest for criminal trespass and possession of burglar's tools. Later, in the Amtrak police office, Rodgers' fellow police officer inquired of the defendant as to the ownership of the key. The defendant initially denied ownership of the key, but later, after further questioning, conceded that it was his key. He claimed, however, that only clothing was contained in locker Y861. The police officers thereafter opened that locker with a master key and found a sawed-off shotgun and a loaded .38 caliber revolver contained therein. However, they did not remove these items from the locker, but closed it again and placed a police officer there to guard it. Later that day at central booking, defendant attempted to strike a deal with Officer Rodgers, voluntarily telling him that he had some information about guns. He told Rodgers that he had stolen the key from another guy named "Mac", who had offered to sell him those guns for $100 each, but while Mac was asleep in another part of the station, he stole the key from him. Defendant told the police officer that the guns were in that locker. Based on these statements and other information the police had in respect to this defendant, a warrant was issued by a Criminal Court Judge for a search of the locker pursuant to which the guns were retrieved. The officers had not revealed to defendant that they already knew the guns were in the locker, nor did they use that information in procuring the search warrant. On appeal, the defendant reasserts the illegality of the search, the impropriety of the intrusion and also asserts that the People failed to prove his guilt beyond a reasonable doubt in respect to the possession counts. He contends that he did not actually possess these weapons and that there was insufficient evidence to establish constructive possession. It is clear from the evidence that his guilt of constructive possession of the weapons was demonstrated beyond a reasonable doubt by the proof. It is uncontroverted that defendant had the key to the locker in which the guns were contained and thus had dominion and control over them. It is also uncontroverted that he knew that the guns were in that locker, as evidenced by his voluntary statements to Police Officer Rodgers. As

to the claimed illegal seizure of the guns, the hearing court determined that *Miranda* warnings were appropriately administered and that defendant's statements in respect to the guns located in the locker were purely voluntary. Thus, although the initial opening of and entry into the locker was illegal, and the hearing court so found, there was no exploitation of that illegality since the police did not remove anything from the locker, nor did they use that information in later obtaining the warrant. The warrant was issued based not on that initial illegal intrusion, but rather upon the information voluntarily furnished by the defendant at a time when he did not know that the police had already opened the locker and were aware that the guns were contained therein. The burden of the dissent seems to be that the initial arrest of Van Luven was illegal as not being based on "probable cause" and thus that "[a]ll the events leading to defendant's conviction flow from the initial confrontation between Rodgers and defendant in the station concourse." Even the dissent acknowledges, however, that that encounter was a permissible "stop-and-frisk" under the authority of *People v Chestnut* (51 NY2d 14). Moreover, the defendant conceded at the suppression hearing that because of his previously having been arrested for breaking into lockers at train stations, a fact which was known to Officer Rodgers, and because he was in the vicinity of the lockers at Penn Station in the early morning hours of June 16, Officer Rodgers had probable cause to approach him. Additionally, it should be remembered that the hearing court was able to observe the witnesses as they testified (an opportunity not accorded an appellate court), and specifically found the testimony of Officer Rodgers to be credible. The issue, however, is whether, even if that encounter and subsequent search and arrest of Van Luven were illegal, that illegality so tainted the later-discovered, illegally possessed guns as to activate the exclusionary rule and not only bar their receipt into evidence but require a dismissal of the indictment. To state the question is to answer the question. A clearer case of attenuation could hardly be made. Here *Miranda* warnings were appropriately given, and such statements as were then elicited were not only exculpatory but were not in any way coerced. It was not until later that day after they had opened the locker with a master key that the police acquired any information about the guns. However, this fact was not known by or revealed to Van Luven when he made his voluntary admission in an "attempt to make a deal". Moreover, the warrant was issued by the "impartial Magistrate" on the basis of the inculpatory information voluntarily supplied by the defendant, which furnished more than enough probable cause for the search of the locker. Under these circumstances, the search warrant was based upon probable cause, independent of any illegal search of the locker by Police Officer Rodgers, or any illegal search and seizure of the defendant. Thus the seizure of the weapons was attenuated from such taint as may have initially existed. (*Wong Sun v United States*, 371 US 471.)

Fein, J. (dissenting). Defendant's conviction flows from a search and arrest based more on his reputation than on probable cause. In fact, by any objective standard there was no probable cause to search and arrest this defendant. The indictment should have been dismissed. Defendant was apparently a familiar figure to police in the Manhattan railroad stations. In May, 1981 he had been convicted of criminal mischief in the fourth degree and sentenced to 90 days (including time served) for attempting to break into a Pennsylvania (Penn) Station locker. In imposing sentence the Judge had orally suggested that defendant keep out of trouble by staying away from train stations. Just 20 days later, at about 1:15 on the morning of June 16, 1981, Amtrak Police Officer Rodgers, in civilian clothes, observed defendant near a bank of lockers in a Penn Station concourse, leaning on his left hand against locker Y861 and "manipulating" the lock mechanism with his right hand. A female companion,

with whom defendant had been arrested on a prior occasion, was standing nearby. The concourse was otherwise deserted. As defendant spotted the approaching officer, he stopped what he was doing and crammed his right hand into his waistband. Rodgers ordered defendant up against the wall, and when defendant ignored him and tried to walk by, Rodgers threw him against the wall and grabbed defendant's right hand which was still "trying to put something into his waistband." Rodgers testified that the reason he wanted defendant up against the wall was because defendant "was under arrest for — there was supposed to be a Court order telling Mr. Van Luven to stay out of the station", a fact Rodgers said he had learned from fellow police officers in connection with an earlier arrest of defendant. (Rodgers conceded that neither he nor any of the other officers had actually seen such an order, but that it was just a "verbal contract" between defendant and the Judge.) Rodgers also testified that he wanted to frisk defendant because he "feared for [his] safety". This fear was assertedly based on two facts: (1) defendant's "suspicious" behavior in reaching into his waistband, and (2) a confidential informant's tip that Rodgers said that he had heard about, indicating that defendant was known to carry a shotgun. (Rodgers conceded that his only personal contact with the source of this tip — which did not come directly to him — may have been to throw the informant out of the train station on occasions when the informant had no business there.) After throwing defendant against the wall, Rodgers was finally able to yank defendant's hand out of his waistband. Rodgers pried open defendant's clenched fist, only to find the key to locker Y861. During this scuffle Rodgers noticed a green canvas bag on the floor at defendant's feet, with its contents open to view — a crowbar, screwdrivers and a flashlight. Rodgers then read defendant his rights and had defendant and the female taken to the police station on the concourse nearby, where defendant was charged with criminal trespass and possession of burglar's tools. Apparently an additional charge of attempted burglary, third degree, was contemplated, but never pursued. According to Rodgers, defendant told him, both at the scene of the arrest and later at the police station, that he had just removed the tools from his locker and was on his way home. But it is common knowledge that the key to an available, unlocked, locker can only be removed by turning the key, after inserting a coin, thus locking the door. If defendant had just opened locker Y861 and removed any of its contents, he could not still have had the key in his possession, unless he had just inserted another coin and relocked the door. However, this is not consistent with the testimony of Rodgers, whose action was premised upon the belief that defendant was trying to break into the locker. While defendant was being held, Rodgers returned to the scene of the arrest and had locker Y861 opened with a master key. Inside he found a shotgun, a revolver, ammunition and clothing. He closed the locker without removing any of its contents and had a police officer stand guard. Later, according to Rodgers, defendant offered the unsolicited new information that there were guns in the locker. He related that he had met an individual known as "Mac" in the train station who had told him that he had guns stashed in a locker, and wanted to sell them for $100 each. According to Rodgers, defendant told him that he waited until Mac fell asleep and then stole the key to the locker. It was as defendant was about to open this locker that he was arrested. Rodgers then obtained a search warrant for locker Y861, and seized its contents. All the events leading to defendant's conviction flow from the initial confrontation between Rodgers and defendant in the station concourse. Although the detention and warrantless search of defendant at that time was tantamount to an arrest, the Court of Appeals has described such a confrontation as the classic "stop-and-frisk" (see *People v Chestnut,* 51 NY2d 14). But even in a stop under these circumstances, the policeman's suspicion of commis-

sion of a crime must be reasonably based upon specific and articulable facts. We do not concede, as the concurring memorandum of Justice Alexander intimates, that the stop and frisk here was "permissible". A police officer has the authority, without warrant, to detain a person he reasonably suspects has committed or is about to commit a crime, for the purpose of obtaining identification and explanation of conduct (CPL 140.50, subd 1). In *People v De Bour* (40 NY2d 210), the Court of Appeals established a sliding scale of permissible police conduct, starting with the right of a police officer to stop an individual acting suspiciously in a high-crime area for the purpose of making routine inquiries. Such a minimal intrusion can be expanded if the individual's response is unsatisfactory or the policeman's suspicions are further aroused as a result of that inquiry. The court made it clear that an inarticulable suspicion would not, in and of itself, constitute the basis for a forcible restraint or seizure. Assuming Rodgers, upon recognition of defendant, acted on the basis of his knowledge of (1) defendant's prior criminal activities at the station; (2) the court order Rodgers had heard about, directing defendant to stay out of the station; and (3) the tipster's information that defendant was known at times to carry a shotgun, there was still no articulable reason for a physical intrusion at this time. Granted, a police officer may stop and frisk a suspect where he "reasonably suspects that he is in danger of physical injury" (CPL 140.50, subd 3). The information possessed by Officer Rodgers, either standing alone or considered in conjunction with his observations at the scene, simply did not rise to the level of reasonable suspicion warranting a self-protective frisk (*People v Hauser*, 80 AD2d 460). Here the only activity on defendant's part which might have caused Rodgers to fear for his safety was defendant's thrusting of his hand into his waistband immediately after being observed "manipulating" the lock — a movement that Rodgers himself described in testimony as "trying to put something *into* his waistband" (emphasis added). The majority disregards this crucial concession. Even assuming that Officer Rodgers had the right, under these circumstances, to grab defendant's hand and remove it from the waistband, once he spotted the key in defendant's fist the basis for a frisk vanished. The revelation of the key on the one hand dissipated any immediate threat (by weapon) to Rodgers' safety, and on the other established a valid reason for defendant being where he was. Rodgers' arrest of defendant and his female companion at that time was baseless, and appears to have been an act of frustration by the police officer who had physically detained an individual only to fail in turning up any evidence of a crime. Even Rodgers' observation of the bag of tools did not justify an arrest. Rodgers conceded at trial that the tools did not appear to be altered in any way for use in furtherance of criminal activity. The concurring memorandum of Justice Alexander cites defendant's "uncontroverted" knowledge that there were guns in the locker, "as evidenced by his voluntary statements" to Rodgers. There were no written statements. We have only Rodgers' testimony, imperfect as it is, as to what defendant allegedly told him about the contents of the locker. Cross-examination exposed Rodgers' testimony as confused and self-contradictory. Defendant bore no burden of taking the stand to "controvert" such testimony. There was insufficient evidence of a criminal trespass, possession of burglar's tools or attempted burglary, as initially charged. It was only as a result of defendant's unlawful detention that he was subsequently accused of criminal possession of weapons located in the locker whose key had been in his possession. Defendant's behavior was consistent with innocence. Rodgers' discovery of the key should have been a signal to attenuate rather than increase the intensity of the confrontation. The arrest and subsequent seizure of physical evidence were unjustified under the circumstances. Accordingly, the judgment should be reversed and the indictment dismissed.