■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SHABAN CELAJ, Appellant. [760 NYS2d 482] —Judgment, Supreme Court, Bronx County (William Mogulescu, J.), rendered October 12, 1999, convicting defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree, and sentencing him, as a second felony offender, to a term of 2 to 4 years, affirmed. The matter is remitted to Supreme Court, Bronx County, for further proceedings pursuant to CPL 460.50 (5).

Defendant's suppression motion was properly denied. In *Terry v Ohio* (392 US 1 [1968]), the United States Supreme Court determined that a limited search for a weapon may, in certain circumstances, be conducted in the absence of probable cause to arrest, where a police officer's action "was justified at its inception, and * * * was reasonably related in scope to the circumstances which justified the interference in the first place" (*id.* at 20). In *People v Prochilo* (41 NY2d 759, 761 [1977]) the Court of Appeals set forth specific guidelines for evaluating frisks within New York's four-tier structure for evaluating the propriety of police-citizen encounters (*see People v De Bour*, 40 NY2d 210, 223 [1976]). *Prochilo* consisted of three consolidated appeals, all of which involved, as here, a handgun which had been taken from the defendant as a result of a frisk. The Court of Appeals noted that generally, in reviewing suppression rulings, "much weight must be accorded the determination of the suppression court with its peculiar advantages of having seen and heard the witnesses" (41 NY2d at 761). The *Prochilo* Court then offered specific guidelines for determining whether a predicate for police action would justify a frisk. These included, but were not limited to: (1) whether there was proof of a describable object or describable conduct which provided a reasonable belief that an individual possessed a gun; (2) whether the manner of the officer's approach and the seizure of the gun were reasonable; and (3) whether there was evidence of any probative worth that the police were conducting a pretext stop or were otherwise motivated by improper or irrelevant purposes (*id.* at 761-762). In *People v Chestnut* (51 NY2d 14, 23 [1980], *cert denied* 449 US 1018 [1980]), the Court of Appeals applied the principles discussed in *Prochilo*, warning that, "in this difficult area of street encounters between private citizens and law enforcement officers, [courts must not] attempt to dissect each individual act by the policemen; rather, the events must

be viewed and considered as a whole, remembering that reasonableness is the key principle when undertaking the task of balancing the competing interests presented."

The suppression hearing in this case was held over three years after defendant's arrest. The motion court recognized that the substantial time lapse invariably resulted in faded memories and inconsistencies in the accounts provided by the four testifying officers. However, despite these inconsistencies, most of which are not germane to the issues on appeal, the totality of the record supports the court's findings of fact, extracted from the collective testimony, that two to three minutes after receiving a 911 call reporting a dispute involving guns and describing two white men, one in his 60s and one in his 30s in a red Buick Skylark at 754 Mace Avenue, the arresting officer arrived at the scene and observed two men fitting the descriptions, one of whom was defendant. The Buick Skylark was no longer at the location.

The arresting officer drove up to 754 Mace Avenue, which was on the south side of the street. As he parked, he observed a white man in his 60s standing in the entryway landing outside the building, with a conspicuous bulge under his jacket in his waistband, at his left hip. Two officers approached defendant (the testimony is inconsistent as to whether the other officer had reached, and was engaged in a conversation with, the defendant before the arresting officer approached). However, it is uncontested that only the arresting officer viewed the waistband bulge, which he testified he thought was a gun. The arresting officer approached defendant and either "lifted up" or "pushed aside" his jacket, revealing a gun.

Given that (1) the police were at the address minutes after, and in response to a 911 call describing a dispute with guns; (2) they were presumably anticipating a possible confrontation with armed, dangerous individuals; (3) the arresting officer matched defendant with the 60-year-old white man in the radio call; and (4) the officer observed a bulge in the left side of defendant's waistband (*see People v De Bour, supra* at 221 ["unlike a pocket bulge which could be caused by any number of innocuous objects, a waistband bulge is telltale of a weapon"]), the limited frisk of the defendant was justified (*see People v Benjamin*, 51 NY2d 267, 271 [1980]; *People v Chestnut, supra* at 22 [" 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.' (*Terry* [*supra* at 27].)"]; *People v Soler*, 268 AD2d 376 [2000], *lv denied* 95 NY2d 804 [2000] [defendant matched description of a male Hispanic

wearing shorts over his pants driving a van, and observation of a suspicious bulge justified the limited protective frisk]; *People v Sanders*, 235 AD2d 507 [1997], *lv denied* 89 NY2d 1015 [1997]).

*People v Garner* (196 AD2d 727 [1993]) is instructive. In that case, the police received a radio tip of an armed robbery in progress, akin to the report of a dispute between men with guns reported here. The radio reports in both *Garner* and this case provided responding officers with a reasonable assumption "that a potential for great danger existed" (*Garner, supra* at 727), a fear which was heightened, in both cases, by the observation of a bulge in the waistband of defendant, an individual who matched one of the individuals described over the radio (*id.; see Benjamin, supra* at 270; *People v Ayala*, 265 AD2d 155 [1999], *lv denied* 94 NY2d 860 [1999] [anonymous radio call of shots fired, coupled with observation that a driver of the car matching the vehicle described in the radio run in same location provided reasonable suspicion for stop and frisk]). In *Garner*, the police eventually determined that no robbery had taken place, but we nonetheless held that a limited frisk of the defendant's waistband area was justified. Although a verbal inquiry preceded the frisk in *Garner*, the absence of such inquiry does not negate the justified fear of a weapon which supported this frisk (*see Matter of Terrell W.*, 299 AD2d 177 [2002]; *People v Tratch*, 104 AD2d 503, 504 [1984]).

The dissent attempts to distinguish these facts from the requirement set forth in *Prochilo* that there be, "proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession" (41 NY2d at 761). However, here, unlike all of the cases reviewed in *Prochilo*, the officer's approach was preceded by a 911 call about a dispute with guns. The 911 call provided information that there were armed individuals at the location, a concern which was heightened when one of the officers observed a bulge at defendant's left hip. *People v Russ* (61 NY2d 693 [1984]), cited by the dissent, is also distinguishable on its facts. In that case, the 911 call indicated that a suspect sitting in a blue car with a white top at a specific location had passed a weapon to another person. When the police arrived at the location, they saw the suspect sitting in the car. She was asked to step out of the car for inquiry, which the Court found proper (*id.* at 694). However, the police had been told that the suspect had given the gun to another person, and in the circumstances, which, notably, did not involve the officer's observation of a bulge, the Court concluded that a frisk was not justified (*id.* at 695).

In this case, the red Buick Skylark had left the area when the police arrived. However, this was only one of a number of facts reported in the 911 call which prompted the police response. The observation of a white male in his 60s with a bulge in the left side of his waistband was consistent with the description a participant in the dispute involving guns reported to the 911 operator. It would not be unreasonable for the officer who conducted the frisk to conclude, upon seeing a bulge at defendant's left hip, that while the dispute may have been over and the car no longer at the exact location reported in the 911 call, one of the armed participants remained (*cf.*, *People v Brown*, 215 AD2d 333 [1995] [defendant and another man's presence approximately three blocks from robbery and their apparent nervousness insufficient predicate for frisk]). In any event, there is no evidence that any of the officers here had an improper motive to single out this defendant, or that their actions were otherwise pretextual (*see Prochilo, supra* at 762). Concur—Mazzarelli, Sullivan and Marlow, JJ.

Nardelli, J.P., and Ellerin, J., dissent in a memorandum by Ellerin, J., as follows: Shortly after noon on April 21, 1995, police officers responded to a radio report that two white men driving a red Buick Skylark were engaged in a "dispute with firearms" in front of 754 Mace Avenue in the Bronx. One of the men was reported to be in his 60s and the other in his 30s. The officers' testimony at the suppression hearing established that when they arrived there was no red Buick Skylark on the scene. Defendant was standing in front of the specified address. The arresting officer, Christopher VonKessel, testified that, when he drove up, defendant, "who appeared to be in his 60s," was engaged in conversation with Sgt. Richard MacDowell. As he was parking his car, VonKessel observed a bulge beneath the jacket of defendant's suit at his left hip. Although this bulge was "nondescript" and revealed neither the outline nor the butt of a gun, VonKessel moved quickly, on the "hunch" that it was a gun, put his hand on the bulge and, brushing defendant's jacket aside, removed a gun from defendant's person.

Sgt. MacDowell's version of the events differed somewhat from VonKessel's. He denied that he was talking to defendant when VonKessel arrived. He testified that upon his arrival he spoke to defendant's son, who had waved to him from inside a black Ford Bronco parked across the street from 754 Mace Avenue and informed him that it was defendant who called 911 after two guys in a red Skylark threatened them with a gun before driving away on Boston Road. He told MacDowell that

defendant was inside the building and, when MacDowell looked across the street, he saw defendant standing in a courtyard in front of the building. As MacDowell crossed the street to talk to defendant about the men in the red Skylark, he saw VonKessel approaching to his right. VonKessel reached defendant, who "was just simply standing there," ahead of MacDowell by a few steps and, before MacDowell had a chance to speak to defendant, he saw VonKessel slide defendant's jacket to the side and remove a gun from defendant's waist. Until that moment, MacDowell had had no idea that defendant might be carrying a gun.

The hearing court's findings of fact depict yet a third version of events. The court found, inter alia, that MacDowell and VonKessel approached defendant from across the street at the same time, although not in tandem. The officers were about to speak to defendant to determine whether he was a complainant or a gunman, when VonKessel noticed the "telltale" bulge at the waist and accordingly frisked him instead. The angle of VonKessel's approach enabled him to detect the bulge that MacDowell could not see. The court thereupon held that the radio report, a communication that should cause any police officer to fear for his life, combined with the necessity of making a split-second judgment as to whether defendant, who fit the "broad" description reported of one of the perpetrators, was in fact one of them, and the observation of the waist-level bulge in defendant's jacket justified VonKessel's frisk of defendant as an act to protect his own safety. Quoting from *People v Benjamin* (51 NY2d 267, 271 [1980]), the court opined that VonKessel did not have to await the "glint of steel" before he could so act.

The conflicting hearing testimony renders it impossible to determine precisely what each officer did when he got to 754 Mace Avenue on April 21, 1995. I note, in addition, that some of the facts found by the court, which did not make its credibility assessments explicit on the record, are not supported by any of the testimony (e.g., that VonKessel was approaching defendant from across the street with the intention of questioning him, when he saw the bulge). But it is uncontroverted that there was no red Skylark on the scene when the police arrived and that defendant was calmly standing outside the building. For the reasons that follow, I would hold that Officer VonKessel's intrusive action was not justified and that defendant's motion to suppress the gun should have been granted and the indictment dismissed.

Police action must be justified in its inception and must be

reasonably related in scope to the circumstances that rendered its initiation permissible (*People v De Bour*, 40 NY2d 210, 215 [1976]). A police officer may forcibly stop and detain a person when he has a reasonable suspicion that that person has committed, is committing or is about to commit a crime; if, in the course of performing such a stop, he has a reasonable suspicion that the person is armed and therefore dangerous, he may frisk the person (*Terry v Ohio*, 392 US 1 [1968]; *People v De Bour, supra*; CPL 140.50 [3]). Thus, whether Officer VonKessel had a right to frisk defendant upon a reasonable suspicion that defendant was armed and therefore dangerous depends on whether he had a right in the first instance to forcibly stop and detain defendant upon a reasonable suspicion that defendant had committed, was committing or was about to commit a crime (*see Terry v Ohio, supra* at 33 [Harlan, J., concurring] ["I would make it perfectly clear that the right to frisk in this case depends upon the reasonableness of a forcible stop to investigate a suspected crime"]).

The hearing court plainly believed that, since defendant can be described as a white man in his 60s and one of the gunmen was described as a white man in his 60s, VonKessel's suspicion that defendant was that gunman was reasonable. However, the generic description, "white male in his 60s," is too vague a description by which to identify any white male in his 60s and therefore fails to satisfy the demand of the Fourth Amendment and New York Constitution, art I, § 12 for specificity in the information upon which police action is predicated (*see Terry v Ohio, supra* at 21 n 18; *People v Dodt*, 61 NY2d 408, 415 [1984]; *see also People v Brown*, 215 AD2d 333, 333 [1995] ["The information relied on by the officers * * * is an insufficient predicate for the police action. * * * There was no description of the perpetrators other than that they were black"]; *Matter of Rubin M.*, 271 AD2d 291, 291 [2000] ["the generic description of the perpetrator * * * could just as readily have applied to countless Bronx and Manhattan residents"]). The red Buick Skylark was the distinctive element in the description reported to the police in this case, and that element was lacking when the police arrived on the scene (*cf. People v Russ*, 61 NY2d 693, 694 [1984] [finding defendant in blue car with white top parked in front of 123 West 112th Street, specific description and location indicated in radio report, warranted officer's asking her to step out of car for inquiry]).

Of course, the police are duty bound to investigate a report (*People v Benjamin*, 51 NY2d 267, 270 [1980]) and when directed to a location cannot "ignore possible indications of

criminality" or "reject the natural mental connection between newly encountered facts and the substance of the radio message" (*id.* at 271). As the Court of Appeals recognized in *People v Benjamin*, it would be unrealistic for a police officer who had been told that guns might be present to assume the risk that a defendant's stepping back while reaching with both hands to the rear of his waistband where it is well known that a weapon may be carried, though possibly consistent with innocuous or innocent behavior, was in fact innocuous or innocent (*id.*). In such a situation, "[i]t would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety" (*id.* at 271).

However, such was not the situation in which Officer VonKessel found himself. The new facts VonKessel encountered, rather than confirming or enhancing the substance of the radio message he had received (*cf. People v Salaman*, 71 NY2d 869, 870 [1988] [officer's independent observation corroborated information received as to specific description of suspect and suspect's exact location]), negated it. Instead of two men in a red Skylark, VonKessel observed one man quietly standing on the sidewalk. There was no red Skylark in sight. The hearing court found that VonKessel and MacDowell saw defendant, approached him and were about to speak to him when VonKessel saw the bulge at defendant's waist. These facts belie any inference that the officers believed defendant posed a danger to them before VonKessel noticed the bulge. Indeed, VonKessel did not testify, nor could he reasonably have testified, that he believed defendant was one of the gunmen. In sharp contrast to the circumstances that the police encountered in *People v Benjamin* (51 NY2d 267 [1980]), here there were no factors rapidly developing or observed at the scene (*id.* at 270), there was no significant occurrence that indicated a possible threat to any of the officers' lives (*id.* at 271), and defendant engaged in no conduct that was consistent with both criminal and innocuous or innocent behavior, thereby rendering dangerous any officer's assumption of the risk that it was in fact innocuous or innocent (*id.*).

It has indeed long been held that a waistband bulge is "telltale of a weapon" (*People v De Bour*, 40 NY2d at 221). However, the observation of a waistband bulge alone does not satisfy the People's burden of proving a reasonable suspicion that a defendant was committing a crime (*People v Barreto*, 161 AD2d 305, 307 [1990], *lv denied* 76 NY2d 852 [1990]). The observation of a waistband bulge alone does not even satisfy the People's burden of proving the level of suspicion required

for the least intrusive police action (*see People De Bour, supra* at 221, 223; *see also People v Hollman,* 79 NY2d 181, 189-190 [1992]). The police action must be evaluated according to the context in which it takes place (*see People De Bour, supra* at 221 ["Viewed in the context of a late night encounter on a lonely street coupled with the apparently evasive crossing of the street, the officers should have been expected to request clarification as to the source of the waistband bulge"]). The People contend that VonKessel's frisk of defendant was justified given the circumstances in this case. But, absent a red Skylark, a description of the suspect sufficiently specific to be susceptible of corroboration by any officer's independent observations of defendant, and any remarkable conduct on the part of defendant himself, the totality of the circumstances here reduces to that bulge.

VonKessel, moreover, only had a "hunch" that it was a gun. "Mere 'hunch' or 'gut reaction' will not do" (*People v Sobotker,* 43 NY2d 559, 564 [1978]). There must be "proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession" (*People v Prochilo,* 41 NY2d 759, 761 [1977]). In the two cases in *Prochilo* in which police officers saw a bulge, one revealing "the complete outline of a revolver" and the other "having 'the configuration of a handgun,' " the Court of Appeals held that suppression should have been denied because the officers' belief that the defendant was carrying a gun was warranted (*id.* at 762). However, in the case in which the officer testified that "defendant had done nothing wrong, that he could not tell what the heavy object appeared to be by looking at the pocket, and that until he had reached into the pocket he had not seen 'any part of what appeared to be a gun, a handle, a barrel, or anything like that,' " the Court held that the gun should have been suppressed because there was nothing in the defendant's behavior or demeanor or in the fact that a heavy object slid against the material of his pocket "which [could] be said to be reasonably referable to or indicative of the presence of a revolver" (*id.* at 763). Here, as in the third case decided in *Prochilo,* there was nothing in defendant's behavior or demeanor or in the fact that there was an undefined bulge at his waist that could be said to be reasonably referable to or indicative of the presence of a gun.

In each of the cases relied on by the People in support of their argument, the police not only could "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed their] intrusion" upon

the defendant's constitutionally protected interests (*Terry v Ohio, supra* at 21), but also the intrusion was reasonably related in scope to the circumstances that rendered its initiation permissible (*People v De Bour, supra* at 215). In *People v Soler* (268 AD2d 376 [2000], *lv denied* 95 NY2d 804 [2000]), two complainants told police officers that they had been robbed at gunpoint in the same building minutes earlier by a male Hispanic wearing shorts over a pair of pants who had fled the scene in a dark-colored van. Twenty minutes later, the officers came upon a dark-colored van about a half mile away from the building. It was the only such van in the area, and the driver was a male Hispanic. After the initial stop, the officers noticed that the driver was wearing shorts over a pair of pants and there was a bulge at the waistband and they frisked him. In *People v Thomas* (258 AD2d 413 [1999], *lv denied* 93 NY2d 980 [1999]), police officers observed that defendant spent most of the night on a deserted street, where there were no open businesses and no entrances to apartment buildings, in an area known for the sale of illicit drugs. At the end of a brief conversation with him, the officer noticed a bulge in his waistband. He asked what it was and tapped it. In *People v Harris* (132 AD2d 672 [1987]), within a minute after receiving a radio report that a black male had fired a gun in front of a particular address, police officers found the defendant, a black male, standing with a young boy in the doorway of the building. There was no one else in the vicinity. As the officer approached, the defendant began to walk away and the officer could see that he was covering a bulge in his jacket pocket with one hand, which caused him to walk awkwardly. The officer asked him what he was doing there, to which he replied evasively, and the officer asked what was in his pocket and patted the pocket.

Similarly, in the cases relied on by the majority, the police had descriptions of suspects that they could corroborate by their own observations or the bulge they observed was recognizable as a gun. In *People v Garner* (196 AD2d 727, 727 [1993]), the arresting officers arriving at a store where an armed robbery was reportedly in progress saw two men leaving the store "who so closely fit the radioed descriptions of the two robbers that the reliability of the tip could reasonably be assumed." In *People v Ayala* (265 AD2d 155, 155 [1999], *lv denied* 94 NY2d 860 [1999]), moments after responding to an anonymous call of shots fired from a described vehicle, officers observed defendant "in a car that substantially matched the description of the vehicle in the radio run and that was at the precise location described therein." In *People v Tratch* (104 AD2d 503 [1984]), a

pedestrian gave a detailed description of a man with a gun and then identified a man fitting that description as the man with the gun. In *Matter of Terrell W.* (299 AD2d 177, 177 [2002]), as they drove slowly past appellant, who was standing in the street, police observed at his waist a bulge "resembling a gun."

Undeniably, the police had an "objective credible reason" to speak to defendant upon their arrival at 754 Mace Avenue (*People v De Bour, supra* at 223). Indeed, Sgt. MacDowell testified that he was approaching defendant for this very purpose when VonKessel intercepted defendant and frisked him before saying anything either to him or to MacDowell. However, since they did not have a reasonable suspicion that defendant had committed, was committing or was about to commit a crime, which would have justified forcibly stopping and detaining him, there was no justification for frisking him (*Terry v Ohio*, 392 US 1 [1968]; *People v De Bour, supra*; CPL 140.50 [3]).