THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANDREW RIVERA, Respondent.

First Department, January 8, 1981

### APPEARANCES OF COUNSEL

*Michael J. Ferguson* of counsel *(Mark Dwyer* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Henriette D. Hoffman* of counsel *(William E. Hellerstein,* attorney), for respondent.

### OPINION OF THE COURT

Ross, J.

Once again we confront the "inherently troublesome" *(People v Chestnut,* 51 NY2d 14, 19), maze of a street encounter between an individual citizen and law enforcement officers. At 10:00 P.M. on August 8, 1979, Police Officer Sanchez, a veteran detective, and his partner arrived in an unmarked police car at the intersection of 173rd Street and Audubon Avenue. Prior to departure from the stationhouse, these officers had been informed that their assigned

sector of patrol was a high crime area, where in the past week youths had been stabbed and shot during fighting among teen-age gangs. On this hot summer's night, the officers were also told that an anonymous caller alerted the authorities that a teen-age gang fight would take place that night.

Forearmed with this information, the officers, immediately upon arrival at the above-mentioned intersection, observed a group of youths "milling" around. In particular they noticed the defendant who was leaning against a parked automobile with his right hand "stuffed" into his jacket pocket. Detective Sanchez easily pinpointed the defendant because he was the only one wearing a jacket on this hot night and because the other teen-agers continually approached defendant and engaged in conversation. Throughout these encounters defendant's right hand never left his jacket pocket and he continually gazed up and down the street.

The officers decided to investigate. They made a U-turn and pulled their vehicle alongside the one against which defendant was leaning. Both officers remained in their car and Sanchez, from the passenger seat, called out to defendant, asking to talk to him. As the defendant approached, Sanchez noticed that defendant's right hand remained inside his jacket pocket. Sanchez became more apprehensive and, as defendant neared, he said "Say man why don't you get your hand out of your pocket? You get me nervous". Defendant complied, but as he did so he simultaneously turned his body so that the jacket pocket, in which defendant had his hand, was turned away from the officer's view and as defendant removed his hand, Detective Sanchez clearly saw a heavy object in that pocket. The officer noticed that the right side of defendant's jacket was "falling down", was "heavily weighted" and was "pulling down from an obvious weight".

Defendant then squatted down alongside the car door and Officer Sanchez inquired as to what was happening. Defendant replied that they were expecting trouble from a neighboring gang which was supposed to be heavily armed and whose members would be wearing distinctive shirts and

"more than likely * * * would have guns on them." As the conversation continued, centering on gangs and guns, Detective Sanchez became increasingly apprehensive. He feared that defendant was attempting to conceal a weapon. At that point, Sanchez asked defendant whether he was also carrying a gun. Before an answer could be provided, the officer reached out of the car window and grabbed defendant's right hand jacket pocket. Sanchez immediately recognized the "heavy object" therein as a gun and seized a secreted .38 calibre pistol.

There certainly can be no dispute that these officers were permitted to intrude on defendant's liberty for the purpose of requesting information (*People v De Bour*, 40 NY2d 210, 223). This lowest level of permitted instrusion was justified by the information imparted to these officers prior to the start of their tour of duty. Moreover, the street scene later encountered—a group of youths milling around and engaging their leader (the defendant) in continuous conversation, with the latter's hand thrust into a jacket pocket on a hot August night—provided greater impetus for an inquiry. Indeed, these officers were duty bound to inquire and would have been derelict in their obligations had no action been undertaken. After a conversation between Detective Sanchez and defendant was initiated, and surely conducted in a most unobtrusive manner, and defendant removed his hand from his jacket pocket, all the while executing evasive maneuvers, the officer then observed a heavy object pulling down defendant's coat. It was only then that the limited frisk of defendant took place.

The latter part of this scenario must not be considered in isolation but viewed in its entirety as a dynamic encounter where compelling considerations are cast in competing roles (*People v Chestnut, supra*, at p 19; *People v Benjamin*, 51 NY2d 267). Our task then is to balance the defendant's right to be free from arbitrary searches and seizures with the enforcement duties of police officers. In considering whether the conduct of Detective Sanchez was justified, the standard to be utilized is reasonable suspicion and not absolute certainty (*People v Chestnut, supra*, at p 22). "The officer need not be absolutely certain that the individual is

armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *(Terry v Ohio*, 392 US 1, 27.) Prior to the limited intrusion, defendant admitted that he was expecting trouble from a neighboring gang which was heavily armed. This information, coupled with the facts gleaned from all possible sources, could lead a prudent police officer to reasonably conclude that in this volatile setting trouble was imminent, and defendant, through his actions and in his role as leader, was concealing a handgun in his jacket pocket. To prevent injury to either himself or other members of the community, Detective Sanchez took the precautionary measure of touching the outside of defendant's jacket. This limited intrusion validated the officer's reasonable suspicions and confirmed that defendant was undeniably engaged in unlawful pursuits. Under these circumstances, Sanchez possessed "specific and articulable facts which, taken together with rational inferences from those facts, reasonably [warranted the] intrusion" *(Terry v Ohio, supra*, at p 21). The predicate for the police action clearly dictated that the minimal intrusion employed was reasonable in scope and, therefore, permissible.

Defendant's reliance on *People v Bernard* (41 NY2d 759) would at first blush appear to lend credence to his contention that the weapon should be suppressed. However, this reliance is superficial, at best, and topples under the weight of detailed analysis. In the present situation the hearing court found that the police officer acted in a manner befitting a street-wise policeman, but that the encounter "did not bespeak an ominous or dangerous situation for the officer" and that there was no "immediate threat to the officer's safety." In *Bernard (supra)*, the Court of Appeals found that the police officer was not apprehensive for his own safety. In the case before us, the officer's language and actions, contrary to the findings of the hearing court, indicate exactly the contrary. Moreover, in *Bernard (supra)*, the police were on routine patrol when stopped by defendant and his friend. There was, therefore, no reason to suspect that anything was amiss when the police stopped their vehicle. Here the police had information about past criminal conduct in this area in recent days and were alerted to imminent trouble.

Also in *Bernard (supra)*, the police made no inquiry of defendant prior to touching his pocket. Here, prior to a frisk, Detective Sanchez engaged defendant in a conversation. In the course thereof, this officer noticed a heavy object in defendant's coat pocket, and throughout this encounter, meticulously studied the furtive moves of defendant.

Defendant would have us view each sequence, starting with the knowledge gained at the precinct and ending with the now-complained-of intrusion, in total isolation. This we should not do. Our function is to consider the conduct of each participant and the circumstance surrounding that conduct, as a whole *(People v Benjamin, supra)*. Seen in this light, the intrusion effected by Detective Sanchez did not violate the Fourth Amendment rights of defendant.

In addition, the trial court erred in finding that the People were required to prove that the detective had probable cause for his touching the outside of defendant's pocket. Here, as in all stop-and-frisk cases, the standard to be applied is not probable cause, but rather reasonable suspicion. *Certainty* is not required *(People v Chestnut, supra;* CPL 140.50, subd 3). To require more than "reasonable suspicion" in a stop-and-frisk case is to require "that a police officer [must] await the glint of steel before he can act to preserve his safety" *(People v Benjamin, supra,* p 271). The courts should reject such an absurd notion. The police officer is not an actor in a Holywood scenario, where the quick draw of the gun provides exciting entertainment for the viewers. Rather, the police officer is experiencing the dangers of the real world where the Marquis of Queensberry rules do not apply. To require that a police officer, participating in a true life "emergency situation[s] where the difference between life and death is often measured in seconds, must isolate those persons whom they have probable cause to arrest from all bystanders * * * is patently absurd" *(People v Chestnut, supra,* at p 21).

The dissent states that the trial court did not find "that the People were required to prove that the detective had probable cause for touching the outside of defendant's jacket." The record specifically indicates that the court did rely upon "probable cause" when it stated, "what I sub-

scribe to or not, under the case law, particularly the cases starting with Terry v. Ohio, the Cantor case and particularly LaPenna and LaBurr[sic], the Court of Appeals and the courts have been quite emphatic, that the quality of the evidence presented here from this officer arises to the level —all right, establishes *probable cause*—this is my instinct and this is how I *feel*—all right." (Emphasis supplied.) I respectfully submit that the dissent is in error.

Accordingly, the order of the Supreme Court, New York County, (TORRES, J.), entered on November 7, 1979, granting defendant's motion to suppress physical evidence, should be reversed on the law and on the facts, and the motion denied.

CARRO, J. (dissenting). I dissent for the reasons stated by the trial court in its memorandum decision. That court did not find "that the People were required to prove that the detective had probable cause for his touching the outside of defendant's pocket." Its written decision states quite clearly, "The actions of the defendant just prior to and during the conversation did not raise the detective's hunch to a level of *suspicion* sufficient to justify the seizure of the defendant's pocket. The tenor of the conversation between the detective and defendant did not bespeak an ominous or dangerous situation for the officer. There was no outline of a gun visible or any immediate threat to the officer's safety". (Emphasis added.)

While it is correct that the court, during colloquy with counsel, indicated that its "instinct" was that the quality of the evidence did not rise to the level of establishing probable cause, that comment did not form part of its ruling. It then reserved decision to permit counsel time to prepare written memoranda and subsequently issued the written decision referred to above.

The precinct had received an anonymous phone call that a gang fight was supposed to occur in that area that night. As Officer Sanchez (the sole witness on the hearing of the motion to suppress evidence) approached, he noted that the defendant was wearing a light, waist length, cotton jacket, which was open.

"I stopped. We double parked next to the car that he was sitting on. I called over to him. He acknowledged. He started walking towards me. When he started walking towards me, he continued, he continued having his hand in his right hand pocket. As he is coming towards me, I asked him, 'Hey man, why don't you get your hand out of your pocket? You getting me nervous', and he complied. As he complied, he turned his body to his right side and came over to the car door, and he squatted down next to the car door * * *

"A. I noticed the right side of his jacket was falling down. It was weighted, heavily weighted as he turned down, as he squatted down. I also noticed that his right, the right side of the jacket was pulling down from an obvious weight on his right side, his right coat pocket.

"Q. And did you see the outline of a gun?

"A. No, I did not * * *

"Q. All right. Now when he turned to his side and squatted down, what occurred next?

"A. We had a conversation. He told me that he was there trying to get the kids off the block; that they were expecting trouble from kids from 180th Street. The kids were supposed to have a lot of guns; that he had tried to set up some kind of a meeting with the kids on 183rd Street but it backfired, it had been a trap. Some of the kids gotten hurt and, his testimony, he was telling me that the only thing he wanted to do [w]as to make sure there was no trouble that night and get the kids out of the area * * *

"A. He also told me if I wanted to get any of those guys all I had to do go up to 183rd Street and look for those type of guys because they were supposed to have some kind of shirts and more than likely they would have guns on them.

"So at that point I asked him 'What about you?' and I reached outside the car window, grabbed his right side and I felt the gun * * *

"Q. What happened after you felt what you believed to be a gun?

"A. I held on to him. I grabbed, I grabbed the gun with my left side—with my left hand and I grabbed him by the

shoulder. My *partner was already out of the car.* He went around him and we placed handcuffs on him.

"Q. And at what point had your partner gotten out of the car?

"A. During the conversation. *As a matter of fact when I said to him 'What about you', he was already out of the car.*" (Emphasis supplied.)

On the basis of this testimony, the conclusions of Trial Term appear correct. The order granting defendant's motion to suppress should be affirmed.

SULLIVAN, J. P., MARKEWICH and LUPIANO, JJ., concur with ROSS, J.; CARRO, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on November 7, 1979, reversed on the law and on the facts, and the motion to suppress denied.