■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NICHOLAS HILL, Appellant. [57 NYS3d 14]—

Judgment, Supreme Court, New York County (Gregory Carro, J. at suppression hearing; Rena K. Uviller, J. at plea and sentencing), rendered March 8, 2012, convicting defendant of criminal possession of a controlled substance in the third degree, and sentencing him, as a second felony drug offender, to a term of two years, affirmed.

The court properly denied defendant's motion to suppress. A team of police officers was assigned as part of a conditions unit to the Polo Grounds, a New York City Housing Authority development. As this development was in a high crime area known for violence and drugs, the officers were patrolling the area to determine whether people other than tenants and invited guests were present, and were therefore trespassing. From a rooftop, police observed defendant coming in and out of the building several times, for short periods of time. An officer next observed defendant enter a car near the building, move something around, and then exit seconds later. Defendant left the area for a few minutes before returning to the front of the building. Two police officers exited their vehicle and approached defendant, stating, "[C]an I ask you a question?," and defendant replied, "[W]hat?" During this time, defendant looked ner-

vous, was looking around, was sweating, and kept grabbing his groin area. The officers asked defendant what he was doing in the building and whether he knew anyone in the building, and defendant told the officers that he was visiting his girlfriend at her apartment in the building. The officers asked defendant for identification, and defendant provided it. Defendant, in his testimony, stated that he informed the officers he had keys to the building, and that if the officers wanted, they could escort defendant to the apartment he had visited.

While defendant waited nearby with the officers, the police investigated his explanation by sending a third officer to the apartment that defendant claimed he was visiting. The police retained defendant's identification[1] to verify if the occupant of the apartment knew defendant. The occupant of the apartment told the police that she did not know anyone by defendant's name or recognize defendant from his identification. The third officer returned "a short time later" after leaving to investigate. Once defendant's explanation for being in the building was proven false, there was probable cause to arrest defendant for criminal trespass.

Defendant was not seized when he provided his identification to the police so they could investigate his explanation for visiting the building. The police did not engage in any other coercive or intimidating conduct that would elevate the encounter to a seizure (*see People v Shands*, 85 AD3d 583 [1st Dept 2011], *lv denied* 17 NY3d 821 [2011]). Defendant's identification was only used for a short time to investigate and defendant provided the identification voluntarily. Moreover, he was not in handcuffs or threatened during this time, and the officers did not draw their weapons.

This Court has repeatedly held that in a trespass situation, a police officer may conduct a brief investigation to ascertain whether a defendant's explanation was credible, and this does not rise to a level three forcible detention or seizure (*see e.g. People v Montero*, 130 AD3d 474 [1st Dept 2015], *lv denied* 26 NY3d 970 [2015] [the officer's request that the defendant remain in the lobby while the officers investigated whether the defendant was a resident or guest of the building was not a seizure]; *People v Donald R.*, 127 AD3d 575 [1st Dept 2015], *lv denied* 25 NY3d 1162 [2015] [the officer's request that the defendant step outside so they could talk to him did not elevate the encounter to a seizure]; *People v Lozado*, 90 AD3d 582 [1st Dept 2011], *lv denied* 18 NY3d 925 [2012] [the officer's request

---

1. The record is unclear as to what type of identification defendant gave the police.

for permission to accompany the defendant to the apartment he was visiting and the defendant agreeing to the request, did not subject the defendant to a level two inquiry]; *People v Francois*, 61 AD3d 524 [1st Dept 2009], *affd* 14 NY3d 732 [2010] [the officer asking the defendant to accompany him to a nearby wall of a subway station and physically grasping the defendant by his elbow, did not elevate the encounter to a seizure requiring reasonable suspicion]).

In determining the lawfulness of police encounters, New York has long followed the four-level test illustrated in *People v De Bour* (40 NY2d 210, 223 [1976]). To determine a seizure under *De Bour*, "[t]he test is whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom" (*People v Bora*, 83 NY2d 531, 535 [1994], citing *People v Hicks*, 68 NY2d 234, 240 [1986]). The dissent cannot point to any New York State case applying the *De Bour* standard to support the broad proposition that a seizure occurs whenever an officer retains a person's identification. Although the dissent cites to several federal and out-of-state cases, those cases present different factual scenarios compared to the circumstances here, and are not controlling.

For example, the dissent cites to *United States v Lambert*, in which the Tenth Circuit held that the defendant was seized when agents of the DEA approached the defendant as he was heading to his car, asked for his driver's license, and began questioning him (46 F3d 1064, 1068 [10th Cir 1995]). However, as the Tenth Circuit explained, the purpose for requesting the defendant's driver's license was to establish his identity, which the agents completed almost immediately after receiving the license, and therefore their 30-minute retention of the license constituted a seizure (*id.* at 1067, 1068 n 3). Here, in contrast, the officers' retention of defendant's identification was brief. There is no indication they did not intend to return it, assuming they could verify that defendant was a guest of a resident of the building where he was seen by the police. Moreover, the officers requested defendant's identification to verify his contention that he lawfully was on the premises, something they could not ascertain without either the identification or bringing defendant with them to the apartment.

In *United States v Battista*, also cited by the dissent, the court focused on a number of factors which it concluded would have led the defendant to be seized (876 F2d 201, 204-205 [DC Cir 1989]). These factors included that the officers roused the defendant from his bed at 6:30 a.m., the defendant was in a

state of undress because of the early morning, the defendant was in a city that was neither home nor his ultimate destination, the defendant was traveling on a train, and the defendant gave his driver's license to the officers (*id.* at 204). Here, except for the brief retention of identification, none of these other factors are present.

Although the dissent contends it is not seeking to create a rule that a seizure occurs whenever a defendant's identification is retained, the fair import of the dissent's analysis is that retention of a defendant's identification always constitutes a seizure. The cases cited by the dissent hold that the taking of identification is but one factor of several to be considered (*United States v Glover*, 957 F2d 1004, 1008-1009 [2d Cir 1992] [enumerated certain factors that might suggest a seizure occurred];[2] *Battista* at 205 ["Although none of these factors taken individually is necessarily determinative, due regard (to) the totality of the circumstances leads us to conclude that the 'interview' with (the defendant) constituted a 'seizure' "]). Even if we were to consider the multi-factor test set forth in the cases cited by the dissent, we see no reason to find a seizure occurred here.

Defendant voluntarily gave the officer his identification[3] and raised no objection when the police brought the identification to the apartment he had identified.[4] Defendant even volunteered to be escorted by the officers to the apartment that he claimed he was visiting. Therefore, defendant knew the officers were going to verify his explanation for being in the building, and defendant raised no objection to the officers retaining his identification for this limited purpose. The dissent's claim that the encounter became nonconsensual when a officer went upstairs with the identification has no support in the record.

Furthermore, the dissent's position is irreconcilable with

---

**2.** In *Glover*, the officers took the defendant to a security room for further questioning and retained his identification (957 F2d at 1009). *Glover* does not support a holding that the retention of identification alone is enough to constitute a seizure.

**3.** The dissent suggests that the identification provided by defendant was a document of significant importance. However, the record does not show what the identification was, or whether it was easily replaceable.

**4.** Contrary to the dissent's position, the fact that defendant voluntarily gave his identification to the officers, and that they subsequently took it upstairs, does not involve a legal issue that required preservation. Rather, it is a fact established by the hearing testimony, and is consistent with our analysis that the encounter does not rise to the level of a forcible seizure until the officers confirmed defendant was trespassing. We also note that the voluntary aspect of defendant's provision of his identification was alluded to by the prosecutor in her closing argument at the suppression hearing.

recent decisions of this Court. Surely, retaining a defendant's identification that was provided voluntarily for a short time, is less of a limitation on his or her freedom than escorting a defendant with several officers to the apartment that he claimed he was visiting, which this Court found was not even a level two inquiry under *De Bour*, much less a seizure (*see Lozado* at 583). It also is less restrictive than police officers physically grasping a defendant by the elbow and guiding him to a wall, and having an officer ask defendant to accompany them away from the area (*see Francois* at 524-525). Likewise, a request by officers that a defendant step outside of a vestibule is more restrictive than the police action that occurred here (*see Donald R.* at 575).

Our decision in *Montero* stands for the proposition that in circumstances such as those here, it is not a seizure when a police officer asks a defendant to wait while they conduct a brief investigation of his reasons for being in a building. The dissent's attempt to distinguish *Montero* by noting that identification was not specifically mentioned in the decision, unnecessarily narrows the holding (*see Montero* at 475). The dissent's focus on whether defendant here could have walked away without his identification ignores the fact that defendant gave the item to the officers in the first instance, so that they could briefly investigate his alleged explanation for his presence in the building. The instant case does not present a situation where the police take someone's identification from them over his or her objection or by force, which would raise different legal issues.

Accordingly, because we conclude that defendant was not seized until the officers were unable to verify his explanation, at which point probable cause existed, we need not reach any of the People's alternative arguments. Concur—Richter, J.P., Manzanet-Daniels, Feinman and Kapnick, JJ.

Gesmer, J., dissents in a memorandum as follows: I respectfully dissent.

Identification is a necessity for navigating daily life in contemporary society. Accordingly, I would find that the police officers' retention of defendant's identification while they undertook an investigation was a significant limitation on his freedom, and thus elevated their encounter with defendant to a seizure. Since the People did not argue that the officers' actions were justified by a reasonable suspicion of criminal conduct, I would grant defendant's motion to suppress the crack cocaine recovered from him, reverse his conviction, and dismiss the indictment.

## BACKGROUND

Defendant was stopped by uniformed Police Officers Aguilar and Beegan outside of the entrance to 2971 Eighth Avenue, one of the buildings making up the New York City Housing Authority (NYCHA) Polo Grounds complex. When Officer Aguilar asked defendant what he was doing and if he knew anyone at the Polo Grounds, defendant stated he was visiting his girlfriend S. in an apartment on the 11th floor. Officer Aguilar requested defendant's identification, which defendant provided.

Officer Ng, another uniformed police officer, joined defendant and Officers Aguilar and Beegan, about 20 yards from the entrance to 2971 Eighth Avenue. Officer Beegan handed defendant's identification card to Officer Ng and instructed him to take it up to the apartment defendant had identified to investigate defendant's claim.

With defendant's identification card in his possession, Officer Ng entered the building and rode the elevator to the 11th floor. When he knocked on the door of the apartment identified, a woman opened the door. Officer Ng showed the woman defendant's identification card and asked if she recognized defendant and if someone named S. lived in the apartment. The woman answered no to both questions. Officer Ng then rode the elevator back to the lobby, exited the building, and told the other officers what he had learned.[1] Defendant was placed under arrest for trespassing. When he was searched at the precinct, 42 bags of crack cocaine were recovered from him.

At the suppression hearing, defense counsel argued, "[O]nce they took his identification and gave it to another police officer he was no longer free to leave. He was seized. [Defendant] can't just abandon his property to the police."[2] The hearing court concluded that there was "clearly no evidence that the defendant was not free to leave" and denied defendant's motion

---

1. The majority has characterized the retention of defendant's identification as "brief." While the record does not state how many minutes Officer Ng was away, it was long enough for him to complete all of these actions while in possession of defendant's identification. Moreover, the People concede that defendant was left waiting with Officers Aguilar and Beegan while Officer Ng was away investigating: "To be sure, during the course of that inquiry, Ng took defendant's identification up to [the] apartment, while defendant stayed behind with Aguilar and Beegan."

2. Defendant also argued that the police were not justified in conducting a level one request for information. Defendant is not pursuing that argument on appeal.

to suppress the crack cocaine recovered from him.[3] The People did not argue, in the alternative that, the officers' actions were supported by reasonable suspicion.

## ANALYSIS

### I. New York Law Broadly Defines a Seizure as the Third of Four Rising Levels of Police Intrusion.

The Fourth Amendment to the United States Constitution and article I, § 12 of the New York State Constitution protect against "unreasonable searches and seizures" (US Const Amend IV; NY Const, art I, § 12). New York courts analyze searches and seizures arising from civilian-law enforcement interactions under the four-level framework enunciated in *People v De Bour* (40 NY2d 210, 223 [1976]). At level one, a police officer may make a request for information when it is supported by an objective, credible reason not necessarily indicative of criminality (*De Bour*, 40 NY2d at 223). At level two, a police officer may, based on "a founded suspicion that criminal activity is afoot," interfere with an individual to the extent necessary to obtain information, provided that the interference does not rise to the level of a seizure (*id.*). At level three, an officer may seize an individual based on reasonable suspicion that he or she is committing or is about to commit a felony or misdemeanor offense (*id.*; *see also* CPL 140.50 [1]). At level four, an officer may arrest an individual based on probable cause to believe that he or she has committed a crime (*De Bour* at 223).

The *De Bour* framework is fundamental to New York State's search and seizure jurisprudence. By setting a standard for scrutinizing police encounters that fall short of a seizure, it affords more rights than those provided under federal law (*compare Florida v Bostick*, 501 US 429, 434 [1991] [Fourth Amendment applies only to police encounters which constitute seizures], *with People v Hollman*, 79 NY2d 181, 195-196 [1992] [rejects *Bostick* and holds police encounters short of a seizure implicate privacy rights]). In addition, *De Bour*'s four-tiered analysis "provide[s] clear guidance for police officers seeking to act lawfully in what may be fast-moving street encounters and a cohesive framework for courts reviewing the propriety of police conduct in these situations" (*People v Moore*, 6 NY3d 496, 499 [2006]).

When confronted with either a level one request for information or a level two common-law inquiry, a person has a right to be "let alone" and may refuse to engage with the police (*see*

---

3. The hearing court also denied defendant's motion to suppress his statements. Defendant does not challenge that decision on this appeal.

*People v Howard*, 50 NY2d 583, 590 [1980], *cert denied* 449 US 1023 [1980] [the defendant was permitted to refuse to answer a level one request for information]; *Moore*, 6 NY3d at 500 [the defendant was free to "continue about his business without risk of forcible detention" when police only possessed a founded suspicion that criminality was afoot], citing *People v May*, 81 NY2d 725, 728 [1992]). Indeed, the right to be let alone significantly distinguishes the limited intrusion allowable under a level two common-law inquiry from a level three seizure: "If . . . a suspect who attempted to move could be required to remain in place at the risk of forcible detention[,] the common-law right of inquiry would be tantamount to the right to conduct a forcible stop and the suspect would be effectively seized whenever only a common-law right of inquiry was justified" (*Moore*, 6 NY3d at 500). Thus, once a police officer forces a person to stop and engage, the encounter is elevated from a lower level intrusion to a level three seizure.

For a seizure under level three of *De Bour*, "[t]he test is whether a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom" (*People v Bora*, 83 NY2d 531, 535 [1994]). In *Bora*, the Court of Appeals explained that it was not constrained to interpret the search and seizure provisions of the New York State Constitution as identical to the Fourth Amendment (*Bora*, 83 NY2d at 534), and stated that "we have not required that an individual be physically restrained or submit to a show of authority before finding a seizure . . . . [O]ne may be seized if the police action results in a significant interruption [of the] individual's liberty of movement" (*id.* [internal quotation marks omitted]).

Consistent with this, the Court of Appeals has characterized a variety of police actions as seizures including, for example, police pursuit (*People v Holmes*, 81 NY2d 1056, 1057-1058 [1993], citing *People v Martinez*, 80 NY2d 444, 447 [1992]).[4] Similarly, it held that a defendant who voluntarily entered a police car after being asked for information about a homicide was seized when an officer began driving away slowly and told the defendant to "just keep [his] hands where [he] [could] see them," thus restraining his freedom of movement (*People v Boodle*, 47 NY2d 398, 400-401 [1979], *cert denied* 444 US 969 [1979]).

---

4. In contrast, the United States Supreme Court rejected mere police pursuit as constituting a seizure in *California v Hodari D.* (499 US 621, 629 [1991] ["(A)ssuming (the) pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled"]).

However, no published New York State decision has reached the exact issue presented by the facts of this case: when a pedestrian has voluntarily turned over his identification in a level one encounter, whether the officer's retention of the identification without the pedestrian's consent, for the purposes of conducting an investigation, elevates that interaction into a seizure under level three of *De Bour*.

## II. Federal Appellate Courts Have Analyzed the Retention of a Defendant's Identification in a Manner Consistent with *De Bour*.

Two federal appellate courts have applied analyses consistent with the *De Bour* framework to hold that the taking and retaining of a pedestrian-defendant's identification is a fact to consider in determining whether a seizure has occurred (*see United States v Lambert*, 46 F3d 1064, 1066 [10th Cir 1995]; *United States v Battista*, 876 F2d 201, 205 [DC Cir 1989]). These holdings are important for two reasons. First, as discussed above, the Court of Appeals has adopted "more protective standards under the State Constitution" than are required under federal law (*People v Torres*, 74 NY2d 224, 228 [1989]). Therefore, these federal cases, although not binding on us, serve as a useful baseline from which to analyze the issue before this Court.

Second, these decisions specifically weighed the retention of a pedestrian-defendant's identification as a factor in concluding that the defendant was seized. This distinguishes these cases from those cases holding that the retention of a defendant's identification following a traffic stop constituted a seizure where the driver would have been violating the law to drive away without a license (*see People v Banks*, 85 NY2d 558, 562 [1995], *cert denied* 516 US 868 [1995] [retention of the defendant's driver's license during a traffic stop elevated the encounter to *De Bour*'s third level]; *United States v Walker*, 933 F2d 812, 816-817 [10th Cir 1991], *cert denied* 502 US 1093 [1992] [the defendant was seized when his license and registration were retained during a traffic stop]). In contrast, these federal cases hold that retention of the defendant's identification was a fact to consider in determining whether the defendant was seized, even though the defendant would not have been violating the law by walking away.

In *United States v Lambert*, the United States Court of Appeals for the Tenth Circuit held that defendant Lambert was seized when DEA Agents retained his identification in an airport parking lot while they questioned him (46 F3d at 1068). As Lambert was walking to his car in the airport parking lot,

DEA agents asked to see his identification and his plane ticket. Lambert voluntarily complied. The DEA agents then retained Lambert's identification during their 20-to-25 minute conversation with him. The Tenth Circuit held that the retention of Lambert's identification transformed the encounter into a seizure because "Mr. Lambert would not reasonably have felt free to leave or otherwise terminate the encounter with the agents because his driver's license had not been returned to him" (*Lambert,* 46 F3d at 1068). The decision included two statements relevant to this case.

First, the Tenth Circuit stated, "While we agree with the government that Mr. Lambert could have left the airport by plane, taxi, or simply walking down the street, as a practical matter he was not free to go" (*id.*). The Tenth Circuit thus recognized that, while a motorist-defendant stopped on the road is literally stranded until his or her driver's license is returned, the freedom of a pedestrian-defendant deprived of his or her identification is also substantially infringed despite the fact that he or she could theoretically walk away. As the Tenth Circuit stated, "The question is not . . . whether it is conceivable that a person could leave [the] encounter. . . . [W]hen law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter" (*id.* at 1068). This analysis is in line with New York's rule that a seizure may flow from a significant interruption of a defendant's liberty of movement (*Bora,* 83 NY2d at 534).

Second, the Tenth Circuit's statement that Lambert would not reasonably have felt free to "leave or otherwise terminate the encounter" while his driver's license was being retained echoes the distinction in our New York State standard between the right "to be let alone" at levels one and two of *De Bour* and the greater deprivation of liberty upon escalation to level three. Indeed, the Tenth Circuit explicitly stated that the issue before the court was whether Lambert was the subject of a "consensual encounter" (the federal equivalent under *Bostick* of *De Bour*'s level one and two intrusions) or an "investigative detention" (*Lambert,* 46 F3d at 1067). In this way, the holding in *Lambert* highlights that the retention of a person's identification forces the person to stop (*see May,* 81 NY2d at 728 [requiring reasonable suspicion before interfering with the defendant's right to be let alone and "forc(ing) (the defendant) to stop"]).

In *United States v Battista,* an Amtrak police officer and a DEA Special Agent retained defendant Battista's identification

while they interviewed him at the entrance to his train roomette (876 F2d 201, 205 [DC Cir 1989]). The interview began when Battista was roused from sleep at 6:30 a.m., when he was in a state of partial undress and in a place that was neither his home nor his final destination (*Battista*, 876 F2d at 204). Under these circumstances, the deprivation of Battista's identification did not impede him from accomplishing some task; indeed he was simply located on a moving train. Nonetheless, the United States Court of Appeals for the District of Columbia Circuit recognized, even under the narrower federal standards, that the retention of Battista's identification was a factor to consider in determining whether he was seized (*id.* at 205).

In reaching its conclusion, the District of Columbia Circuit employed a tiered analysis similar to the *De Bour* framework. While the Court found that questioning Battista at an early hour, in a foreign location, while he was partially undressed "may not be enough to render the contact a seizure at its inception, it surely became one after Battista was asked for his identification and upon perusal the identification was not returned" (*id.* at 205). Thus, the District of Columbia Circuit recognized that the retention of a person's identification is an action that may elevate an otherwise low-level police interaction to a seizure requiring reasonable suspicion.[5]

### III. Holding That Defendant was Seized is Consistent with *De Bour* and Prior Decisions of this Court.

Defendant acknowledges that New York law has not addressed whether the retention of a defendant's identification may elevate a police encounter to level three of the *De Bour* framework. However, I would hold that, under *De Bour* and its progeny, the officers' retention of defendant's identification elevated this police-civilian encounter to a level three seizure.

In *De Bour*, the Court of Appeals stated, "We are cognizant of the fact that police-citizen encounters are dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds" (*De Bour*, 40 NY2d at 225). Therefore, "the tone of police-initiated encounters with civilians can be

---

5. The Court also stated, "It is well established that the mere request for identification does not inevitably give rise to a seizure. But once the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee we find it difficult to imagine that any reasonable person would feel free to leave without it" (*Battista*, 876 F2d at 205 [citation omitted]).

subtle and ever-shifting" (*Hollman*, 79 NY2d at 191). In describing a *De Bour* analysis, this Court has cautioned that, "[t]he latter part of th[e] scenario must not be considered in isolation but viewed in its entirety as a dynamic encounter where compelling considerations are cast in competing roles" (*People v Rivera*, 78 AD2d 327, 329 [1st Dept 1981], *appeal dismissed* 54 NY2d 1021 [1981]). Thus, we must examine the totality of defendant's encounter with Officers Aguilar, Beegan and Ng to determine whether it rose to a higher level intrusion requiring a heightened degree of suspicion under *De Bour*.

Here, defendant's interaction with the police officers began when Officer Aguilar asked defendant what he was doing at the Polo Grounds complex. Merely asking a suspected trespasser about his or her reasons for being at an apartment building is a level one intrusion under *De Bour*, and only requires the support of an objective, credible reason (*see People v Greene*, 271 AD2d 235, 236 [1st Dept 2000], *lv denied* 95 NY2d 853 [2000]).

Next, Officer Aguilar requested to see identification, which defendant provided. A mere request to see identification only implicates level one of *De Bour* as well (*see Hollman*, 79 NY2d at 185). Thus, the encounter between defendant and the officers began at level one of the *De Bour* framework.

However, the encounter shifted once Officer Beegan handed defendant's identification to Officer Ng and instructed him to take it into the building to investigate. This action significantly interrupted defendant's liberty of movement in that it prevented defendant from going about his business and deprived him of the right to be let alone. Accordingly, it raised the encounter from level one of the *De Bour* framework to level three and required the support of reasonable suspicion.

New York law does not require an explicit submission to authority in order to find a seizure under *De Bour*'s third level (*Bora*, 83 NY2d at 534). A significant interruption of one's liberty of movement will suffice (*id.*; *see also Holmes*, 81 NY2d at 1057-1058 [police pursuit requires reasonable suspicion because it significantly impedes a defendant's liberty of movement]). It is undisputed that defendant was left waiting with Officers Aguilar and Beegan while Officer Ng was in the building investigating with his identification. The fact that defendant had to wait for Officer Ng to finish investigating, in order to have his identification returned, constituted a significant interruption of his liberty of movement. Indeed, a reasonable person in defendant's position would have perceived that his identification would only be returned upon Officer Ng's comple-

tion of the investigation, and that he would only be certain to obtain the return of his identification if he remained close to Officers Aguilar and Beegan. Therefore, the interaction met the test for a seizure, because "a reasonable person would have believed, under the circumstances, that the officer's conduct was a significant limitation on his or her freedom" (*Bora* at 535).[6]

The retention of defendant's identification by Officer Ng also prevented defendant from going about his business or refusing to continue engaging with the officers. If defendant had walked away from Officers Aguilar and Beegan while Officer Ng was away investigating, he would have abandoned his identification.[7] Accordingly, defendant did the only reasonable thing anyone in his position would have done; he remained waiting with Officers Aguilar and Beegan for his identification to be returned.

Contrary to the majority's characterization, holding that defendant was seized is not equivalent to holding that the retention of a person's identification always constitutes a seizure. The *De Bour* analysis requires that the entirety of a police encounter be analyzed to determine whether the challenged police conduct was justified by the appropriate level of suspicion (*Rivera*, 78 AD2d at 327-329). Moreover, determining whether a seizure has occurred involves the "most subtle aspects of our constitutional guarantees" (*Bora*, 83 NY2d at 535 [internal quotation marks omitted]). Of course, there are certain police actions that by their nature tend to significantly

---

**6.** The majority has highlighted that the record is unclear as to what exact identification was taken from defendant. Officer Ng implied that the identification card had a photograph of defendant on it because he showed the identification card to the woman who answered the door, and asked her if she recognized defendant. In any event, the specific form of the identification is not dispositive of whether or not a reasonable person in defendant's position would have found his or her freedom significantly limited. The form of the identification retained has not been determinative of whether the court determined that its retention constituted a seizure (*see United States v Glover*, 957 F2d 1004, 1009 [2d Cir 1992] [retention of photocopied social security document and handwritten work identification]; *State v Holmes*, 569 NW2d 181, 185 [Minn 1997] [university identification card retained]).

**7.** The view that a reasonable person whose identification has been retained by law enforcement would simply walk away and abandon the identification has been rejected by two state appellate courts, including one state supreme court (*see People v Mitchell*, 355 Ill App 3d 1030, 1034, 824 NE2d 642, 647 [2005], *appeal denied* 215 Ill 2d 611, 833 NE2d 7 [2005] ["A reasonable person simply would not leave his identification behind and go about his business"]; *State v Daniel*, 12 SW3d 420, 427 [Tenn 2000] ["Abandoning one's identification is simply not a practical or realistic option for a reasonable person in modern society"]).

interrupt a defendant's liberty of movement and therefore require reasonable suspicion (*see e.g. Holmes*, 81 NY2d at 1057-1058, citing *Martinez*, 80 NY2d at 447 [police pursuit requires reasonable suspicion because it significantly impedes liberty of movement]). I would not hold that the retention of a defendant's identification is such an action, but rather that it is a fact suppression courts must consider when analyzing the entirety of a police encounter to determine whether an officer's actions were justified.

Since I would hold that defendant was seized, I must consider whether his seizure was supported by reasonable suspicion. Here, the People did not argue at the suppression hearing that the officers' actions toward defendant were supported by reasonable suspicion. Therefore, we may not make that determination on this appeal (*see* CPL 470.15 [1]; *People v LaFontaine*, 92 NY2d 470, 474-475 [1998]).

In addition, on this record, we cannot conclude that defendant consented to the retention of his identification. On the issue of consent, "the burden of proof rests heavily upon the People to establish the voluntariness of that waiver of a constitutional right" (*People v Whitehurst*, 25 NY2d 389, 391 [1969]), and the People may not raise the issue for the first time on appeal (*People v Dodt*, 61 NY2d 408, 416 [1984]). At the suppression hearing, the People only argued that defendant voluntarily provided his identification in response to Officer Aguilar's level one inquiry. The People never argued that defendant consented to the retention of his identification or that its retention was within the scope of defendant's response to Officer Aguilar's request for information. The People raised neither of these unpreserved theories of consent on appeal. Therefore, we should not sua sponte consider whether defendant consented to the retention of his identification.

Holding that defendant was seized is consistent with *People v Montero* (130 AD3d 474, 475 [1st Dept 2015], *lv denied* 26 NY3d 970 [2015]). In *Montero*, we only addressed the legal implications of an officer asking a person to wait in a NYCHA building's lobby while that person's reasons for being there are investigated.[8] *Montero* did not reach the issue of whether the retention of the person's identification during that investigation would have constituted a seizure.

As this court has stated, "A case . . . is precedent only as to those questions presented, considered and squarely decided"

---

8. Our initial holding was that we declined to apply our interests of justice jurisdiction to consider this unpreserved issue (*see Montero*, 130 AD3d at 475).

(*People v Bourne*, 139 AD2d 210, 216 [1st Dept 1988], *lv denied* 72 NY2d 955 [1988]). Therefore, *Montero* held only that a person suspected of trespassing is not seized when an officer merely asks the person to wait while an investigation is conducted. *Montero* does not answer whether, under *De Bour*, an officer must have reasonable suspicion in order to take the additional step of retaining a person's identification while the investigation is conducted (*see People v Garcia*, 20 NY3d 317, 322 [2012]; *Martinez*, 80 NY2d at 447).[9]

Holding that defendant was seized is also consistent with the remaining cases cited by the majority, in which we held that various types of police intrusions did not amount to a level three seizure. In *People v Donald R.* (127 AD3d 575 [1st Dept 2015], *lv denied* 25 NY3d 1162 [2015]), we held that a request by police officers that a person step outside of a public housing vestibule in order to talk was not a seizure and need only be supported by a founded suspicion of criminal activity. In *People v Francois* (61 AD3d 524 [1st Dept 2009], *affd* 14 NY3d 732 [2010]), officers asked to speak with the defendant and guided him to a nearby wall by briefly grasping his elbow without force, which we held was a level two intrusion and not a seizure.[10]

Finally, in *People v Lozado* (90 AD3d 582 [1st Dept 2011], *lv denied* 18 NY3d 925 [2012]), we held that asking for permission to accompany a person to an apartment he claims to be visiting in a NYCHA building is not a level two intrusion.

9. The City of New York recently acknowledged this distinction as part of its settlement of a federal civil rights suit dealing with alleged unlawful police conduct on NYCHA grounds (*see generally Davis v City of New York*, 902 F Supp 2d 405 [SD NY 2012]). As part of the settlement reached with the *Davis* plaintiffs, the City agreed to revise the lesson plans used to train police officers on how to patrol at NYCHA buildings. The revised lesson plan instructs officers that holding onto a person's identification could lead a reasonable person to believe that he or she is no longer free to walk away. Therefore, the lesson plan instructs that an officer may not hold onto a person's identification unless the officer has reasonable suspicion (*see Davis v City of New York*, case No. 1:10-cv-00699-SAS-HBP, documents 339 [Final Order of Approval of Settlement and Dismissal with Prejudice], 330 [Stipulation of Settlement and Order at 9], 329-2 [NYPD Lesson Plan at 22, 27], available at http://nypdmonitor.org/wp-content/uploads/2015/10/Davis-v.-City-of-New-York-Settlement-and-Exhibits.pdf [accessed Mar. 29, 2017]).

10. The People argued at the suppression hearing only that the police officers' conduct constituted a permissible level one request for information and the hearing court so found. If the majority's citation to *Donald R.* and *Francois* may be read as implying that the officers' actions constituted a level two intrusion, then the suppression motion should have been granted as the People did not argue that the police had a founded suspicion of criminal activity (*see* CPL 470.15 [1]; *LaFontaine*, 92 NY2d at 474).

In each of these cases, the defendant was able to extricate himself from the police encounter. Therefore, each defendant retained the "right to be let alone" characteristic of levels one and two of *De Bour*, and these police intrusions did not evolve into seizures. In *Donald R.*, the defendant was free to choose not to accompany the police officer out of the building and to walk away from the entire encounter. In *Francois*, the defendant could have freely walked away from the guiding of his elbow without force. In *Lozado*, the defendant was free to elect not to go with the police officer up to the apartment that he claimed to have been visiting and to walk away. Unlike in this case, none of these defendants was deprived of his identification by an officer who was away investigating. Therefore, none of these defendants risked abandoning his identification by walking away or refusing to engage with the officers. Similarly, none of these defendants was forced to remain waiting in order to have his identification returned.

In light of these significant differences, these cases do not address police actions comparable to those undertaken in this case. Contrary to the majority's suggestion, the retention of defendant's identification is not equivalent to accompanying a person to an apartment he claims to be visiting, or merely asking a person to step outside of a vestibule to speak. These sorts of actions are among the many options available to a police officer investigating a suspected trespass on public housing grounds. However, neither of these options require a person to surrender his or her property to an officer's exclusive possession while an investigation is conducted, the issue at stake on this appeal.

Accordingly, holding that defendant was seized in this case is a conclusion supported by New York law and consistent with our prior cases, and would not run the risk of overruling or limiting our prior holdings. Rather, it would recognize, in a manner consistent with *De Bour*, that the retention of defendant's identification, under the circumstances of this case, significantly interrupted his liberty of movement. Therefore, it required reasonable suspicion.

IV. The Crack Cocaine Should be Suppressed and the Indictment Dismissed Because the People Failed to Address Whether Defendant's Seizure was Supported by Reasonable Suspicion.

At a suppression hearing, the People bear "the burden of going forward *to show the legality of the police conduct in the first instance*" (*People v Berrios*, 28 NY2d 361, 367 [1971] [internal quotation marks and emphasis omitted]). Here, the People failed to meet their initial burden because they did not

argue at the suppression hearing that, if defendant was seized, his seizure would have been legally permissible because it was supported by reasonable suspicion.

The People argue, in the alternative, that if this Court holds that defendant was seized, the hearing court's ruling should be affirmed because the evidence in the record shows that the officers possessed reasonable suspicion at the time that they retained defendant's identification. However, this Court may not affirm a suppression decision on a ground that was neither decided adversely to defendant nor reached by the hearing court (CPL 470.15 [1]; *LaFontaine*, 92 NY2d at 474-475 ). In addition, we may not reach an argument for affirmance that the People did not preserve (*Dodt*, 61 NY2d at 416; *see also People v Wilson*, 175 AD2d 15, 16 [1st Dept 1991], *lv denied* 78 NY2d 1015 [1991] [People could not argue for the first time on appeal that officers conducted a lawful stop and frisk when the People only argued at the suppression hearing that the officers conducted a lawful arrest]).[11]

Accordingly, I would grant defendant's motion to suppress the crack cocaine recovered from him, and dismiss the indictment against him (*People v Cameron*, 48 AD2d 783 [1st Dept 1975]).

---

11. The People have also argued that this Court should remand this matter for further proceedings on the issue of reasonable suspicion if it finds that defendant was seized. However, the People had a full and fair opportunity to litigate the issues raised at the suppression hearing and neglected to address whether defendant's seizure would have been supported by reasonable suspicion. Accordingly, they are not entitled to a remand to correct their omission (*see People v Havelka*, 45 NY2d 636, 644 [1978] ["Having had a full opportunity to be heard, the People should not be heard again on the same issue"]).